# JENNINGS v. PHILADELPHIA, BALTIMORE, & WASHINGTON RAILWAY COMPANY.*

---

RAILROADS; FELLOW SERVANTS; NEGLIGENCE; PROXIMATE CAUSE; QUESTIONS FOR JURY; CONTRIBUTORY NEGLIGENCE.

1. An arrangement between two railroad companies, whereby both use the tracks owned by one of them, the train employees of both, when running on the tracks, being subject to the train and signal rules and orders of the company owning the tracks, does not make the employees of the owner and licensee fellow servants, so as to bring them under the rule of law applicable to such relation.

2. Violation or nonobservance by a railroad company of one of its rules governing the operation of trains in a block, resulting in injury to a locomotive engineer of a company with which it has a trackage arrangement, constitutes negligence in law; and under such circumstances it is for the jury to determine whether such violation or non-

---

*Fellow Servants—Use of Same Premises.—In a note to *Hardy* v. *Shedden Co.* 37 L.R.A. 59, the authorities dealing with the position of servants of railroad companies which are using the same premises, and their relation as fellow servants, are presented and discussed.

observance was the proximate cause of the injury. (Citing *Clements* v. *Potomac Electric Power Co.* 26 App. D. C. 482.)

3. Where the sufficiency of the evidence to establish a necessary fact is fairly a question of doubt, it is for the jury to pass upon it, under proper instructions by the court; and it is only where all reasonable men can draw but one inference from the undisputed facts, that the question to be determined is one of law for the court. (Following *Adams* v. *Washington & G. R. Co.* 9 App. D. C. 26, and *Morgan* v. *Adams,* ante, 198.)

4. In a suit by a locomotive engineer against a railroad company with which his company had a trackage arrangement, to recover for personal injuries received by jumping from his engine to avoid the result of a threatened collision with a switch engine, it was *held* that the question of his contributory negligence in failing to watch for signal lights after he had entered a block on a signal indicating that there was a clear track was for the jury, involving, as it did, the rules of the defendant, the effect of various signal lights, their character and location, and his duty to look out for them, the character of the track, engine, and train, and the reasonableness of the care he claimed to have exercised, and other circumstances from which care or negligence might be deduced.

5. An act done in the presence or under a reasonably well-founded apprehension of impending danger, for the purpose of escaping therefrom, may not, in the contemplation of law, constitute contributory negligence, although it may in fact have contributed to the production of the injury complained of. (Following *Washington & G. R. Co.* v. *Hickey,* 5 App. D. C. 436.)

6. Whether a locomotive engineer who jumped from his engine to escape what he believed to be an impending collision with a switch engine acted as a man of ordinary judgment would have done under like conditions was held, under the circumstances, to be a question for the jury.

No. 1654.   Submitted February 7, 1907.   Decided March 5, 1907.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in an action to recover damages for personal injuries.                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an action to recover damages for personal injuries, brought by A. Guion Jennings against the Philadelphia, Baltimore, & Washington Railway Company.

Plaintiff was the only witness introduced in support of his action, and rested his case upon the following testimony:

The defendant is, and at all the times in the declaration mentioned was, a body corporate owning, controlling, maintaining, and operating a certain railroad and certain railroad tracks in the District of Columbia, between the certain railway depot or station known as the 6th street depot or station, in the city of Washington, and the Long Bridge, so-called, at or about the foot of 14th street, Southwest, in the said city, and also certain side tracks, turnouts, switches, and yards appertaining to and used and operated in connection with the said railway tracks. The Southern Railway Company is, and at the times aforesaid was, a body corporate for railroad purposes, employing, using, and operating, by arrangement with the consent of the defendant, certain railroad trains, locomotives, and cars upon and over the said railroad tracks aforesaid; that while using such tracks, such engines and trains of the Southern Railway Company and the men operating them were subject to the rules, regulations, and orders of the defendant company.

The plaintiff testified that he had been in the railroad business since 1882, and had been a passenger engineer continuously since 1892, in the employment of the Southern Railway Company, and was familiar with the standard rules governing the operations of trains which have been adopted by the Southern and the defendant companies; that in the month of April previous to the accident he began to run trains into the 6th street station in Washington; before doing so he was examined upon the standard rules by the trainmaster of the defendant company; that prior to this examination he was required to make repeated trips with old, experienced engineers who had been running in and out of Washington for years, and thus familiarize himself with all the signals and switches; that on leaving the 6th street station, going south, trains are governed by hand signals as far as 9th street, and all switches are thrown by switchtenders; that there is a single track from the station to 9th street where the double track begins; that a short distance beyond the 9th street switch there is a semaphore with a paddle, which guards the

entrance to the block, which block terminates at 14th street, near the entrance to the Long Bridge; that a white paddle or white light on the semaphore indicates that the track is clear to 14th street; that between 9th street and 14th street there are three minor switch lights guarding the entrances to three different sidings leading from the main track; that you strike the first of these minor switches just before reaching 12th street, where there is a siding entering a woodyard at that point; that beyond the last switch there was what was known as a derailing switch, put there for the purpose of derailing the train in case the engineer fails to stop at the crossing of the tracks of the Washington, Alexandria, & Mt. Vernon Railroad Company; that at the end of the block there is a semaphore for the Long Bridge; that in passing he had seen the railroad yards between 9th and 14th streets, but never knew anything about the conditions in there; that on the night of October 26, 1904, he had an unusually long train, consisting of nine passenger coaches; he proceeded slowly from the 6th street station, and was let on the double track at 9th street; when he reached the semaphore at 9th street he saw it drop, and the white paddle indicated to him that he had "the right of way to go in the block between there and 14th street;" that he pulled on by the 9th street tower and by 10th street, watching on both sides; that he was watching his fireman, and called the latter's attention to the fact that at or near 14th street there was a signal for the derailing switch, and asked him to watch for it closely, and let him know as soon as its position was changed.

And thereupon said witness further testified as follows:

I was watching both sides and ahead, as it is customary for us all to see anything that might be in the way,—especially at the street crossings, where people run under both sides, and keeping my eye on the fireman at the same time. In doing so I discovered a red light at or near 12th street. I immediately applied my air. I had nine coaches and mail cars pulling out and a very heavy engine, one of the largest engines the Southern have, with a very long wheel base. I don't know its exact length.

I applied my air, and as I came to the switch I saw my train was not going to stop clear of the switch. As I went into the switch, I then called to my fireman to look out. I saw I was going in there, and just ahead of me I saw the switch engine. I saw I couldn't avoid a collision, and perhaps my engine would turn with me on the light tracks, which is customary. As a rule, all side tracks are made of smaller steel, and the tracks don't have the same care. I saw the situation in which I was being placed, and I had done everything to stop the train I could, and if I stayed there I would possibly get killed, or possibly maimed, and that the danger would be less by jumping, and I jumped out in the dark, after calling to the fireman to be on his guard. I jumped from my side of the box out through his gangway. The reason I didn't take my gangway was there was a picket fence along there that prevented my getting out on that side. The distance was so short that I knew that if I delayed getting out through that gangway the fireman would be pinched off, and an accident would happen between the cab and the engine. I just jumped right from my position through that gangway, and landed out on the granite stone on 12th street. I got up immediately. I went down on my knees, but got up and by that time the engine had struck the switch engine. I got up and found that I couldn't stand, so I laid right down by the engine or tank. By the time I jumped out of the gangway I was just the distance of the tank. I was lying between the engine tank and the first car. I suppose those tenders are 18 feet long. That is the distance the train went after I left it. I had brought my train virtually to a safe point and protected the passengers. There was no damage done to the engine.

Plaintiff further testified, on direct examination, that at the time that he approached 12th street and saw this red light he had not located the signal at the derailing switch, nor had he received any signal that the fireman had seen it; that just beyond 12th street there was what was called a distance signal which is a permanent signal or landmark showing green at night, which warns them that they are approaching the derailing switch;

that he saw this signal on that night, but had not seen the sema-phore at the Long Bridge at the time of the accident; that the derailing signal or semaphore for the Long Bridge was a fixed danger, always there, and this signal for the switch at 12th street was a minor trouble; that the switch signal for the 12th street siding was a bull's-eye about 12 inches high, with a lens about 4 to 4¼ inches in diameter, which threw its rays slant-ingly across the track, instead of parallel with it; that as soon as he saw this switch light he put on all of his brakes, but did not reverse his engine; that he did all that he thought was neces-sary to bring his train to a stop, and the train was brought to a stop with the engine standing half way across 12th street; the train entered the switch a little over the length of his engine and tender; the switch was open and a switch engine and crew were in there.

And thereupon the plaintiff further gave evidence tending to prove that by jumping to the ground he sustained a fracture of his left leg and ankle, a wrenching and spraining of the knee, and bruises, and other bodily injuries.

And thereupon, the plaintiff, on cross-examination, further testified that in his examination by the trainmaster of the de-fendant company, before he began to operate trains in the city of Washington, he was examined not only upon the train rules, but also upon the location of the signals, switches, switch targets, etc.; that he was familiar with the standard rule requiring the engineman "to keep a constant lookout on the track for signals and obstructions, and to stop and inquire as to any signal not understood;" that he knew that there were railroad yards be-tween 9th street and the Long Bridge, and that there were switch engines operating in such yards, and switchmen follow-ing such engines to throw the switches; that he was also familiar with the standard rule No. 216, reading: "The rules relating to block signals do not relieve train men from observing all rules in regard to the protection of their trains."

And thereupon said witness further testified as follows:

Q. I asked you whether you did not testify yesterday that

there were signals in between the block signals, which to an engineer operating over the main line might indicate danger?

A. There are switch signals in there that, after getting into the block, if you happened to see them, would indicate danger.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Q. Suppose, Mr. Jennings, you are given, as you enter a block, a clear signal, white paddle or white light, indicating, as I understand, that you can enter that block. That is what it means, is it not?

A. Yes, sir.

Q. Does that mean you can run through that block to the end of it without looking for other signals?

A. It doesn't mean so, sir.

Q. Suppose while you are passing through that block you encounter a red signal on the track, or you are shut off by a hand lamp in the hands of a man, what is your duty as an engineer?

A. I would regard it as a danger signal, and stop immediately, sir.

Q. These railroad blocks are frequently 3 or 4 miles long, are they not?

A. Yes, sir; some of them are even longer than that.

Q. And sometimes they are quite short?

A. Yes, sir.

Q. I wish you would tell us who operated the block signal like the signals at 9th street and the signal at 14th street.

A. A telegraph operator is in each block, and when the train approaches the block from either end he calls up the tower man at the other end to ascertain if the track is clear. The tower man at the other end repeats back, as the case may be "It is clear," or "Blocked," and you get orders accordingly at the block you enter. You get a white signal, and you are supposed to have no obstructions on that track.

Q. As I understand from you, the switches which may be in a block are operated by the switchmen who follow the shifting engines?

A. Some are.

Q. They are not operated by operators in a tower, are they?

A. No; but there are switches that are operated from the tower by the man in the tower.

Q. But as a general thing they are not?

A. As a rule, in ordinary yards, they are operated by switchmen.

Q. These switches between 9th street and 14th street between these two block signals—the 12th street switch, for instance—were operated by these switchmen who followed the switching engine?

A. Yes, sir.

Q. Operated by hand?

A. Yes, sir.

And thereupon said witness, upon cross-examination, further testified that the bull's-eye or switch target when the switch is locked to the main line shows white to the main track and red to the yard, and when the switch is open shows red along the main line track and white to the yard; that such targets, as a rule, are and should be placed so as to be seen by engineers and firemen who are moving engines along the main track; that in moving through railroad yards they encounter a great many such bull's-eye targets, and it is the duty of the engineer to watch for them; that the grade between 9th and 12th streets is somewhat up hill until you reach 11th street, and then it is down hill; that the switch lights are placed at the points of a switch and on the edge of the cross-ties; that the engineer sits on the right hand side of the cab and his seat is directly over the edge of the ties; that he does not think it possible to see the switch light at 12th street until you arrive at 11th street, unless you are especially looking for that particular light.

And thereupon said witness was asked by the court the following question in reference to his fireman, and made the following answer:

Q. Do you know whether he jumped out or not?

A. I know that he didn't jump out.

And thereupon, on cross-examination, plaintiff further testified that if he had observed the red light on the switch at 12th street when he was at 10th street, he could easily have brought his train to a full stop; that he thinks he was about 11th street when he did observe the light.

And thereupon the plaintiff, on cross-examination, admitted making the following signed statement at the hospital after the accident, to Mr. Neely, a representative of the Southern Railway Company:

A. G. Jennings, engineer of train 39, engine 1216, October 26, 1904.

I was engineer on Southern Railroad train No. 39, leaving Washington night of 26th of October, 1904. We left the 6th street station I think two or three minutes late. We were let on northbound track, and crossed over to southbound track before we got to the curve just below the bridge across the tracks. We then proceeded on down the single track to 9th street, where I got white board. It is a straight line from 9th street to 12th. Going along this distance I was looking out for the distance signal, for the crossing near the bridge, and had been explaining to my fireman how he could look across the curve which begins below 12th street, and see the signal. I did not see the switch lamp on the track leading to the 12th street yard until I was almost on it. This switch lamp is a low target. I saw that it was red and immediately put on my brakes. When I got my brakes on I went to the fireman's side, and jumped to the ground on the fireman's side, breaking my left ankle and spraining my right knee. My range of vision was over this low switch lamp, is the reason I did not see it. I was looking out for the semaphores and the signals between 12th street and the bridge, and looked over this signal on the switch target. Simply failed to see it. Just before I got to this 12th street lead switch, I saw some one running towards my engine flagging me down, and this man was trying to reach the 12th street switch ahead of my train. I have learned since that this was the engineer of the switch engine which my engine collided with. I did not jump from my

engine from any fear of collision with the switch engine, but I did not know the lay of the land of this 12th street yard, and feared there might be some trestle or something of that kind in the yard, where I knew some coal was handled. Approaching 12th street I was running slowly, I judge about 7 or 8 miles per hour. The engine ran only a short distance after I put on the brakes.

A. G. Jennings.

Plaintiff, on cross-examination, further testified that statement correctly set forth the facts as he remembered them then, and that he made a similar statement to a representative of the defendant company.

And thereupon the plaintiff, in response to questions by the court, further testified that he had eight or nine passenger coaches and mail cars; that he had safely jumped from his engine on a previous occasion, in a serious accident that happened about a year before on the Southern Railway, and had been in other accidents when he did not think it necessary to jump.

And thereupon plaintiff on redirect examination testified that under the rules of the company in force at that time the block was required to be kept clear for the space of ten minutes preceding the arrival of a regular scheduled train, and it was the duty of anyone desiring to occupy the main line to protect the track and to notify the man in the tower at each end of the block.

On recross-examination plaintiff further testified as follows:

Q. Mr. Jennings, I understood you to say, on cross-examination and also on direct examination, that these switches between 9th street and 14th street were operated by the switchmen, and not by the men on the tower?

A. Those three switches, yes, sir. If they are operated at all they must be operated by hand.

Q. So that, after you were given the white paddle or white light indicating a clear block at 9th street, if any emergency should arise, or any car break away, or any switch become un-

manageable, or anything of that kind, the only way that a train approaching on that track could be given notice of it was either by the shut-off signal or by the red signal on the switch itself. Is not that true?

A. That is true.

\*      \*      \*      \*      \*      \*      \*

Q. As I understand it, all red signals to a railroad man indiate danger,—"stop at once?"

A. Most assuredly.

The court thereupon, on motion, directed the jury to return a verdict for the defendant; and from the judgment thereon the plaintiff has prosecuted this appeal.

*Mr. E. Hilton Jackson* and *Mr. Henry E. Davis* for the appellant.

*Mr. Frederic D. McKenney* and *Mr. John S. Flannery* for the appellee:

1. One who is ignorant of a rule, or is shown not to have understood it, as in the case of *Dunlap* v. *Railroad Company,* 130 U. S. 649, will not be held strictly accountable for its violation; but if, as in this case, he knew of and thoroughly understood the rules, his negligent violation of them strips him of all excuse. Beach, Contrib. Neg. 2d ed. § 373; *Southern P. Co.* v. *Pool,* 160 U. S. 438; *Northern P. R. Co.* v. *Poirier,* 167 U. S. 48.

2. The cases in which the evidence shows the fault to have been wholly on one side are rare. In almost all actions growing out of injuries received in an accident, both plaintiff and defendant have been more or less negligent. The fact that there may have been some negligence on the part of the defendant does not justify the court in submitting the case to the jury. In almost all of the following cases, which are but a few of many cases in this court and in the Supreme Court of the United States in which the action of the trial justice in directing a

.verdict for the defendant upon the ground of contributory negligence of the plaintiff has been approved, or has been reversed for failure to do so, there was evidence tending to show negligence upon the part of the defendant. *B. & P. R. R. Co.* v. *Jones,* 95 U. S. 439; *Griggs* v. *Houston,* 104 U. S. 553; *Schofield* v. *Chicago, M. & St. P. R. Co.* 114 U. S. 615; *Aerkfetz* v. *Humphreys,* 145 U. S. 418; *Elliott* v. *Chicago, etc.. R.. Co.* 150 U. S. 245; *Richmond & D. R. R. Co.* v. *Didzoneit,* 1 App. D. C. 482; *Howes* v. *District of Columbia,* 2 App. D. C. 188; *Stearman* v. *B. & O. R. R. Co.* 6 App. D. C. 46; *Edgerton* v. *B. & O. R. R. Co.* 6 App. D. C. 516; *District of Columbia* v. *Brewer,* 7 App. D. C. 113; *Wash. & G. R. R. Co.* v. *Wright,* 7 App. D. C. 295; *Cullen* v. *B. & P. R. R. Co.* 8 App. D. C. 69; *Hurdle* v. *W. & G. R. R. Co.* 8 App. D. C. 120; *Dashiell* v. *Market Co.* 10 App. D. C. 81; *District of Columbia* v. *Ashton,* 14 App. D. C. 571; *Sardo* v. *Moreland,* 17 App. D. C. 219; *Swart* v. *District of Columbia,* 17 App. D. C. 407; *Harten* v. *Brightwood R. Co.* 18 App. D. C. 260; *Barrett* v. *Columbia R. Co.* 20 App. D. C. 381; *Stewart* v. *Washington & G. F. E. R. Co.* 22 App. D. C. 496; *Chunn* v. *City & S. R. Co.* 23 App. D. C. 551; *Scott* v. *District of Columbia,* 27 App. D. C. 413.

3. The doctrine of fellow-servants and assumed risks is applicable to this case. *Railroad Company* v. *Hambly,* 154 U. S. 349; *Railroad Company* v. *Dixon,* 194 U. S. 338; *Mills* v. *Railway Company,* 2 MacArth. 314.

4. The plaintiff knew the situation of the tracks, yards, and switches, and the character and position of the lights and signals in the block between 9th street and the Long Bridge. He knew that these switches and switch lights were operated by hand; that shifting engines and trains were constantly moving in the railroad yards which connected with the main-line tracks in this block; that the tower operator at 9th street did not and could not control any of the movements in the block, and that there were no means of direct communication between the switchmen and the tower man. If any risk attended this condition of affairs, the plaintiff assumed it by continuing in a service which brought him into direct contact with such physical surroundings.

*Tuttle* v. *Railroad Co.* 122 U. S. 189; *Kohn* v. *McNulta,* 147 U. S. 238; *Dixon* v. *Telegraph Co.* 68 Fed. 630; *Woodley* v. *Railroad Co.* L. R. 2 Exch. Div. 384, 389. The doctrine of assumed risks is entirely independent of the principles of law governing the relation of master and servant. It requires no contractual relation to support it, but is founded upon the maxim, *volenti non fit injuria,* and is applied in all cases where the injured person, whether a servant or a stranger, notwithstanding his knowledge of the possibilities of danger, voluntarily undertakes or continues in an employment, and suffers injury in the course thereof. 1 Labatt, Master & S. §§ 368 *et seq.* If the plaintiff is held to have been the servant of a mere licensee, then the defendant owed him no duty except to refrain from wilfully or wantonly injuring him. *Boggero* v. *Southern R. Co.* 41 S. E. 819; 27 Am. & Eng. R. Cas. N. S. 376, 386; *Crane Elevator Co.* v. *Lippert,* 63 Fed. 945. A mere naked license or permission to enter or pass over an estate will not create a duty or impose an obligation on the part of the owner to provide against the danger of accident. *Illinois Cent. R. R. Co.* v. *Godfrey,* 71 Ill. 507, 22 Am. Rep. 114; *Vanderbeck* v. *Hendry,* 34 N. J. L. 472; *Railroad Co.* v. *Griffin,* 100 Ind. 225; *Severy* v. *Nickerson,* 120 Mass. 307.

5. The plaintiff in this case seeks to evade responsibility for his contributory negligence by relying upon the principle laid down in the case of *Washington & G. R. R. Co.* v. *Hickey,* 5 App. D. C. 436. In that case the passenger injured had done nothing to bring about the dangerous condition which placed her in peril. In this case the plaintiff helped to create the perilous situation, and now seeks to recover damages for the injuries resulting from his own act. A servant who places himself in a perilous position by disobeying a rule made for his protection cannot recover. *Baltzer* v. *Chicago, M. & N. R. Co.* 83 Wis. 459, 53 N. W. 885; *Quirouet* v. *Alabama G. S. R. Co.* 111 Ga. 315, 36 S. E. 599; 18 Am. & Eng. R. Cas. N. S. 551; *Jackson & S. Street R. Co.* v. *Simmons,* 107 Tenn. 392, 64 S. W. 705; and the *Pool* and *Poirier Cases, supra.*

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The first question raised by the errors assigned on the action of the court involves the legal relations of the plaintiff and the employees of the defendant, whose alleged negligence in opening the switch in front of plaintiff's engine is claimed to have been the proximate cause of the injury complained of. Were they fellow servants?

The defendant owned, controlled, and operated the tracks, switches, and appliances necessary for entrance to and egress from what is known as the Pennsylvania station in the city of Washington. By some arrangement between the defendant and the Southern Railway Company, an independent corporation, the latter ran its trains into the station, using the defendant's tracks between the same, and its connection therewith at or near the Potomac river. The train employees of the Southern Railway Company, when running on defendant's tracks, were subject to the rules, regulations, and orders of the latter. These rules and orders related to the movement of the trains, the observance of signals, and nothing more.

The law seems to be well settled that an arrangement of the kind between independent corporations does not make the employees of the owner and the licensee, respectively, fellow servants, so as to bring them under the rule of law applicable to such relations. *Philadelphia, W. & B. R. Co.* v. *State,* 58 Md. 372; *Kastl* v. *Wabash R. Co.* 114 Mich. 53, 72 N. W. 28; *Ziegler* v. *Danbury & N. R. Co.* 52 Conn. 543, 555; *Robertson* v. *Boston & A. R. Co.* 160 Mass. 191, 35 N. E. 775; *Re Merrill,* 54 Vt. 200.

The judgment therefore cannot be supported on this ground.

2. The next question in due order is that relating to the alleged negligence of the defendant.

It appears that there was what is called a block on the main line which the Southern Railway trains used, extending from 9th to 14th street. At each end of this block was a tower provided with the customary signals, and constantly occupied by an

operator. The rules of the defendant, in which plaintiff had been instructed, required this block to be kept clear, that is, unoccupied and unobstructed, for the space of ten minutes preceding the arrival of a regular scheduled train, which plaintiff's train was; and it was "the duty of anyone desiring to occupy the main line, to protect the track and to notify the man in the tower at each end of the block." When plaintiff approached the 9th street end of the block, with his engine drawing a train of nine passenger coaches, he received the signal indicating that the block was clear, and that he should proceed. About 12th street his engine ran into a switch that had been opened for some unknown purpose by some one of defendant's employees. Whether this switch was opened before or after plaintiff's engine entered the block, and with or without notice to the operator in the tower, is immaterial. In either event there was the violation of a rule devised to secure the safe operation of trains upon the block. The violation or nonobservance of this necessary rule of safety constituted negligence in law, and it was for the jury to determine whether it was the proximate cause of the injury. *Clements* v. *Potomac Electric Power Co.* 26 App. D. C. 482, 500.

3. It remains to consider the question of plaintiff's contributory negligence.

There were several switches in the main track of the block on which plaintiff's train was moving, as well as a derailing device at the crossing of the Alexandria and Mt. Vernon Railway, near the 14th street end of the block. The plaintiff testified that just beyond 12th street there was a permanent distance signal, showing green at night, which warns of the approach to the derailing switch aforesaid. He said that the derailing signal was a "fixed danger, always there, and the signal for the switch at 12th street was a minor trouble." The signal for the 12th street switch, which is the one that was open on the night of the accident, was "a bull's eye about 12 inches high with a lens about 4 to 4¼ inches in diameter, which threw its rays slantingly across the track, instead of parallel with it." Witness said that he and his fireman were looking out for the lights, but he

was watching particularly for the signal for the derailing switch. He said that his train was a heavy one, drawn by an engine of the largest size, with a very long wheel base, and was moving slowly. He said that the grade was "somewhat uphill until you reach 11th street, and then it is down hill;" that he did not think it possible to see the switch red light of 12th street, until arriving at 11th street, "unless you are specially looking for that particular light;" that if he had observed the red light when at 10th street he could easily have brought his train to a full stop before entering the switch; that it was about 11th street that he observed the red light; that he immediately put on the air-brakes, and did all that he could to stop the train; but was unable to stop before entering the switch.

Plaintiff admitted that he was familiar with this regulation: "The rules relating to block signals do not relieve men from observing all rules in regard to the protection of their trains." He was familiar, also, with another, requiring engine men "to keep a lookout on the track for signals and obstructions, and to stop and inquire as to any signal not understood." He said, further, that there were many signal lights on the tracks in the block, and that, notwithstanding a signal to enter a block, it was the duty of an engineer to look out for danger signals, and, if he saw one, to come to a stop as soon as possible; that all red lights are danger signals. He further said that as he neared 12th street he saw someone running towards his engine, "flagging him down" and trying to reach the switch ahead of his train; and learned afterwards that it was the engineer of the switch engine with which he was in danger of colliding through passing into the switch.

It being the duty of the plaintiff to keep such a lookout for the danger signals on the track ahead of him as would naturally and reasonably be expected of the average man in his situation and under all the circumstances surrounding him at the time, as testified to, we are not prepared to hold, as matter of law, that he was guilty of such contributory negligence as necessarily to deprive him of any right of recovery for the negligence of the defendant. The question is a close one, depending for its prop-

·er answer upon the rules of the defendant, the effect of the signal given plaintiff to enter the block, and the indication thereby ·of a clear track, the character and location of the signal lights ahead of him, and the duty imposed upon him to keep a lookout ·for each and all of them, the nature of the several dangers to be encountered in the block, the character of the track and the engine and train, the reasonableness of the testimony of the plaintiff in respect of the care that he claimed to have exercised, together with all other surrounding circumstances from which fair inferences of care or negligence might be deduced.   Where the sufficiency of the evidence to establish a necessary fact is fairly a question of doubt, it is the province of the jury to pass upon it, with proper instructions by the court as to the law of the particular case made by the evidence.   The jury are the judges of the credibility of the witnesses and the weight of their testimony, and it is only where all reasonable men can draw but ·one inference from the undisputed facts that the question to be determined is one of law for the court.   *Adams* v. *Washington & G. R. Co.* 9 App. D. C. 26, 30, and cases cited; *Mosheuvel* v. *District of Columbia,* 191 U. S. 247, 252, 48 L. ed. 170, 172, 24 Sup. Ct. Rep. 57; *Morgan* v. *Adams,* Present Term [*ante,* 198] and cases cited.

4. The last question for consideration involves the plaintiff's contributory negligence in leaping from his engine after it entered the switch and threatened collision with the switch engine.

It is perfectly plain from plaintiff's testimony that had he remained upon his engine, which came to a stop shortly thereafter, he would have received no injury whatever.   The engine neither collided with another nor turned over; and the fireman, who remained at his post, was wholly uninjured.   If, therefore, the only inference that can be drawn from his testimony is that he was guilty of contributory negligence ·in leaping to the ground, the judgment would have to be affirmed; a verdict in his favor upon the other points that have been discussed would avail him nothing.

He testified that, having done everything possible to stop the

engine and protect his train, he called to the fireman to look out, and then sprang down into the street. His apprehension was that his engine would turn over on the light tracks, "which is customary." "As a rule all side tracks are made of smaller steel, and the tracks do not have the same care." He had once before leaped from his engine under analogous conditions, and thought if he stayed there he would possibly be killed or maimed, and that the danger from jumping would be less. He could not take his own gangway because there was a picket fence alongside; and "the distance was so short that I knew if I delayed getting out through that gangway"—the one on the fireman's side—"the fireman would be pinched off, and an accident would happen between the cab and the engine." Here, again, the question is a close one, but we think it was one for the determination of the jury. The plaintiff was under obligation to exercise reasonable prudence in looking out for himself if he was, in fact, under a reasonable apprehension of danger. Usually a man of ordinary prudence and judgment will not recklessly rush into danger; at the same time one must suffer the consequences of his unreasonable action under the impulse of panic.

Taking into consideration all the circumstances of real or apparent danger which the jury may find to have surrounded plaintiff at the time, it is for them to determine, as a fact, whether the plaintiff's apprehensions had a reasonable foundation, and his action was such as a man of ordinary judgment and caution might reasonably have taken under like conditions. An act done in the presence or under a reasonably well-founded apprehension of impending danger, for the purpose of escaping therefrom, may not, in the contemplation of law, constitute contributory negligence, though it may in fact have contributed to the production of the injury complained of. *Washington & G. R. Co.* v. *Hickey,* 5 App. D. C. 436, 471.

That was a case where a passenger, reasonably apprehending a collision, leaped from the car and sustained injuries which would not have happened had she retained her seat. The principle, however, is equally applicable in a case like the present,

if the conditions of danger result from the ascertained negligence of the defendant.

Finding no support for the direction of the verdict for defendant in either ground relied on, the judgment must be reversed, with costs, and the cause remanded for a new trial.

*Reversed.*