## Louisville & N. R. Co. v. Welsh.

(Decided Dec. 17, 1937.)

(As Modified on Denial of Rehearing Feb. 11, 1938.)

ASHBY M. WARREN, WOODWARD, DAWSON & HOBSON and R. P. HOBSON for appellant.

CARTER & VEACH for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

This is an appeal from the judgment of the Jefferson circuit court in an action brought by Joseph Welsh against the Louisville & Nashville Railroad Company, before the Honorable Burrel H. Farnsley, judge of the Jefferson circuit court, common pleas branch, second division. After the pleadings were filed completing the issues, the cause was ordered transferred to the fourth division of that branch, with the request that the Honorable Eugene Hubbard, judge thereof, hear and determine the issues.

The facts appear by the record to be that on the night of June 10, 1935, the appellee (plaintiff below) lost his arm when, as alleged and testified by him, he was attempting to cross appellant's railroad tracks and was struck in the back, knocked down, and his right arm run over and severed by a cut of cars, at the time being switched by the agents and servants of appellant on its tracks, at a point thereon just south of New Main street and between it and the foot bridge passing over Bear Grass creek in the city of Louisville, Ky.

At this place, where the accident is alleged to have thus occurred, it appears that the company's tracks run substantially east and west, as does also Bear Grass creek (nearby, to the south of them), and that both are located between and run substantially parallel with New

Main street on the north and Lexington boulevard on the south.

The testimony of the appellee, who was the only eyewitness to his accident and whose testimony consequently is neither corroborated nor contradicted by that of any other witness, as to the facts and circumstances under which the accident occurred, is that he was struck and run over by this cut of cars at about 10:30 on the night of June 10, 1935, as he was returning from a visit with his mother-in-law, who lived north of the railroad tracks, to his own home on the south side of the railroad crossing when these cars were being moved or pushed along its track No. 1 westwardly over this crossing for implacement upon one of its yard sidings.

Seeking to recover damages for the injuries received in this collision, resulting in the loss of his arm, while attempting, it is alleged, as a licensee to use this public pathway leading across the tracks, appellee brought this action, alleging that same was caused by the negligence of the company's servants and agents, in that they carelessly and negligently backed this cut of cars against and over him, resulting in the loss of his right arm, permanently crippling him, and impairing his power to earn money.

After making the formal allegations, his petition further alleged that for a long period of time a foot bridge had been maintained by the city of Louisville as a public passway for the use of pedestrians across Bear Grass creek, from which a pathway led thence northwardly across the system of tracks and switches of the defendant to New Main street and points beyond; further, that during this period numerous persons had continuously and habitually used said pathway leading across the tracks as a street or passway between New Main street on the north and this foot bridge over Bear Grass creek and thence over to Lexington road and Story avenue for their use and convenience in coming and going between these and other points to the south, and that the defendant, its agents, and servants knew that the public generally, having occasion to traverse said region, habitually and continuously used this passway or path leading over and across its tracks at this point as a convenient and accessible route or passway for pedestrians traveling between said points, and "that by reason of the long and continued use by the public,

they became licensees and entitled to the protection required to be given licensees, to-wit:

"The duty to keep said trains under reasonable control and to keep a lookout by persons in charge of said trains while moving across said passway and to give signals of the approach of trains and cuts of cars to said passway, and to keep and maintain lights upon the front of the cars crossing said passway at night."

Further, his petition alleged that on June 10, 1935, *about 9:30 p. m.,* he was following said path or passway, on his way home, walking in a southwardly direction from New Main street towards the aforesaid foot bridge over Bear Grass creek, when after crossing the first track and when he was in the act of stepping onto the second, or next one of the several tracks there, that the defendant, its agents, and servants in charge of switching the cut of cars here involved "negligently and carelessly suffered, caused and permitted the same to run against him," knocking him to the roadbed and cutting off his right arm, thereby causing his injury and resulting damage here complained of.

The plaintiff, to maintain this alleged cause of action against the appellant, testified that he was using this pathway, as pleaded, upon the occasion in evidence at about *10:30 p. m.* and that he "came across there and come across the first track and started to step across the second track, it was like there was a shadow come by me. I turned half way and as I turned, the car hit me in the back and knocked me down and cut my arm off. * * * I rolled away from the train and waited until the train got by me, and then I thought I could get up, but I could not get up. * * * I laid there under the cut of cars got by me. * * * I seen there was nobody on the back end of the engine and I started to crawl. * * * I crawled over towards this gate where they said I was found."

Further, he testified that upon this occasion and hour of the night, when he was returning to his own home south of the track crossing, he first came to the intersection of the C. & O. tracks with New Main street and from there crossed over to this foot path, which he followed, leading him to the first of this series of Louisville & Nashville tracks, which he crossed, and, as stated, he was then starting to step across the second

track when a "shadow" came by him and as he turned "half-way" he was struck in the back by the front one of this cut of cars, then being moved westwardly, and by which he was knocked to the ground, falling in the same direction in which the cut of cars was being pushed. He also stated that when he had gotten to within 4 feet of its first track, there was no obstruction of any kind preventing his having a clear view of the tracks for a considerable distance to the east (the direction from which this cut of cars, which struck him, was then being moved), nor was there anything between him and the well-lighted "MN" (signal) tower, located along these tracks some 200 feet to the east of this crossing pathway which he states he was then using, except perhaps this cut of cars he impliedly refers to as casting the "shadow that came by him" there.

It appears admitted that this "MN" tower was at the time well lighted, and naturally reflected its light over the tracks for a considerable distance, notwithstanding his statement that it was too dark for him to see anything as he attempted to cross the tracks while on this nearby pathway.

In this connection, it may be here also observed that appellee's claim that he was groping in Stygian darkness at the crossing when "it was like there was a shadow" came by him there, just before he was struck, appears somewhat unreasonable and contradictory of the self-evident fact and physical law which imperatively teaches us that there must be light with a shadow, for the conclusive reason that a shadow can only be caused and created by light, not darkness, and that without the creative presence of light, no shadow could have been there formed to "pass him." But however this may be, the appellee was further asked if, from the time he started to go upon the first track until he was later hit, as he stepped onto the second track, he ever looked in the direction of the tower or to the east, from which direction this cut of cars was approaching, to which he answered, "I am not sure." Again, by way of learning what care, if any, he had exercised for his safety before attempting to cross the tracks, he was asked if he had looked in that direction, to which he again answered, "I am not sure," and again:

"Q. In other words, you came along and you crossed over the Big Four track, and then you

walked on over towards the No. 2 track, and you can't say whether you ever looked to the east or not? A. No sir.

"Q. That is correct, is it not? A. Yes sir, that is correct."

When asked if he "never did see the cut of cars" that struck him, he answered, "Yes sir, after I was run over."

He further testified that this pathway across the tracks had long been continuously and habitually used by the public generally and in large numbers daily in practically the same volume every hour up until about 11 p. m., estimated by him to be from 150 to 200, and that it was so used by the public with the knowledge and acquiescence of the company, which he alleged in his petition served to make them licensees in its use during such hours, whose presence, as such, upon this public crossing the appellant was charged with anticipating and by reason of which there was imposed upon it certain precautionary duties required to be observed by it, in order to avert injuring these users of this public pathway in crossing over its tracks.

On the other hand, appellant, though conceding that this pathway crossing was so continuously used in the daytime by a sufficient number of people as to constitute it at such time a publc way and its then users, licensees, nevertheless contends, notwithstanding such concession, that there was no such habitual use of this pathway crossing, in any substantial number, during the night hours when this accident is claimed to have occurred. It sought to establish such fact, by employing special watcher stationed at the foot bridge to make an accurate count of the number of people actually using this crossing pathway over its tracks between the hours of 8:30 and 10:30 p. m.

The special watchers, upon the trial, when called as witnesses, testified that they maintained such watch during these two hours of the night of October 23, when no one used this foot path; that the same was true on the evening of October 24, and likewise again on October 25; while on October 26 only two persons used it, according to an accurate and actual count made by them.

Further, the appellant's testimony, tending to contradict that given by plaintiff (that he was traveling in

this pathway over the railroad tracks when injured and when and where, it is alleged, he was a licensee in its use, whose presence there the appellant was charged with the duty of anticipating and also observing for his safety in its use the aforementioned precautionary measures to avoid injuring him, when it operated its cars across and over the pathway crossing), was to the effect that the appellee was a trespasser when injured in crossing its tracks at the hour or time of night he states he was using such pathway, in that he was at such hour by reason of the desultory and slight use then made by the public of the pathway not a licensee, charging it with the anticipatory duty of safeguarding his presence, even if then in the path, but that, in fact, he was not then using the path in crossing the tracks, but was at a point on the track a hundred feet west thereof, as appellant insists was conclusively shown by the undisputed physical facts in evidence, hereinafter stated, which demonstrate beyond all doubt that appellee when struck was not within the alleged licensed areas of the pathway, but some one hundred feet west thereof.

The evidence for appellee is further that this cut of cars was backing up, with no pilot or cowcatcher on the leading or front car, and that the wheels of the car, which plaintiff says struck him in the back as he wheeled and turned to his right, when seeing the shadow fall, and which knocked him to the ground, "were the only things of the car which came in contact" with his right arm which too was the only part of his body shown struck by them.

On the other hand, the appellant's witness, Bohannan, testifies as follows as to this version of the accident and the appellee's condition when found lying "at the gate" near the track:

"His arm—he was laying there (off the tracks by the gate) and when I looked at him, his arm was cut off just a little bit below the shoulder. I looked at the fellow and there was no blood coming from him.

"Q. Did you later go down and examine the track—No. 1 track? A. Yes sir; I walked out there afterwards.

"Q. Did you find any part of his arm in the No. 1 track? A. I found a piece of it, about from here to here, the elbow.

"Q. Make a mark on that No. 1 track showing the place at which you found that piece of arm? A. Right behind this house, (about one hundred feet from the pathway) right along here, I should say."

Also, the appellant's witness, Cornwell, testified as to these physical facts as follows:

"Q. Did you see there any place on the track where there was any human flesh or any part of Mr. Welsh's arm? A. Yes sir; I did.

"Q. Tell the jury just where that was, please? A. It was just back of the first house on Main Street that was east of this Stoll Oil Station, on what is called Track No. 1, and it leads down into the East Louisville Yards, there was a short piece of bone, I imagine—I judge it was around three inches long and a little flesh and quite a bit of blood on the rail at this point"

(that is, on the north rail of this track No. 1 on which plaintiff claims he was struck and injured and from which point upon the north track, the evidence is further that the appellee then crawled to the back of the house on New Main street where he was found opposite this place).

The testimony for appellant is further, as given by its agent operating this cut of cars at this time when plaintiff claims he was struck and injured by it, that as they were pushing the cut of cars westwardly over the track in question, for placing it on the track siding west of the pathway crossing, they were moving at a speed of only about 4 miles an hour, that the engine bell was kept constantly ringing as they approached this pathway over its tracks, and that its brakeman (who so testifies) was standing on the top of and near the front of the foremost car of the cut, as it was backed, with his lighted lantern and keeping a lookout ahead and that he, though having a clear view westward of the tracks ahead, saw no one anywhere near the tracks or in or near the pathway or attempting to there cross over the tracks.

At the conclusion of this evidence, the court, having overruled the defendant's motion for a directed verdict, upon its own motion gave instructions Nos. 1 to 6 to the jury, only the first three of which are here in-

volved, or material, and which are as follows:

Instruction No. 1:

"If you believe from the evidence that the railroad tracks of the defendant * * * from the point where the footpath referred to in the evidence crosses said railroad tracks to the foot bridge referred to in the evidence, were frequently and habitually used by the public as a footway for such length of time with the knowledge and acquiescence of the defendant, and was a place where the presence of persons might reasonably be anticipated, then it was the duty of the defendant, its agents and servants in charge of the cut of cars referred to in the evidence, to exercise ordinary care to keep a lookout for persons using said path way, and to give reasonable and timely warning of the approach of said cut of cars to said place, by ringing the bell or blowing the whistle; and if you believe from the evidence that the defendant, its agents or servants, or any of them, in charge of said cut of cars were negligent, in that they, or any of them, failed in this duty, and by reason of such negligence, if any there was upon their part, or upon the part of any of them, the cut of cars was caused to run over the plaintiff's right arm, and he was thereby injured, then the law is for the plaintiff * * * and you will so find.

"But unless you so believe from the evidence, or if you shall believe from the evidence as set forth in instructions Nos. 2 or 3, then the law is for the defendant * * * and you will so find."

Instruction No. 2:

"It was the duty of the plaintiff, * * * in crossing the tracks referred to in the evidence, to *exercise ordinary care for his own safety,* and if you believe from the evidence he was negligent, in that he failed to exercise such degree of care for his own safety, and by reason of such negligence, if any there was upon his part, he so helped to cause or bring about the accident and injuries of which he complains, when but for such negligence, if any there was upon his part, said accident and injuries would not have occurred, then the law is for the defendant * * * and you will so find, even though you should further believe from the evidence that

the defendant, its agents or servants, or any of them, were also negligent as set out in the first instruction.''

Instruction No. 3:

''If you believe from the evidence that the plaintiff * * * attempted to cross said railroad tracks and was injured at a place other than the pathway referred to in the evidence, or if you believe from the evidence that he was injured by a train other than the cut of cars referred to in the evidence, then in either of the events mentioned in this instruction, the law is for the defendant, and you will so find.''

Upon submission of the case under these and other instructions and upon this conflicting evidence, the jury returned a verdict for plaintiff for $7,500, upon which judgment was entered.

It is argued for appellant that the judgment is erroneous and should be reversed, in that: (1) The petition did not state a cause of action and appellant's demurrer thereto should have been sustained; (2) the jury should have been peremptorily instructed to find for appellant; (3) the verdict of the jury is flagrantly against the weight of the evidence; (4) its verdict is contrary to the instructions given it; (5) the court gave the jury erroneous instructions; and (6) the appellee was a trespasser, to whom no precautionary duties were owing, where his presence and peril on the tracks were never discovered.

We have carefully read and maturely considered these several criticisms of the judgment and the grounds urged for its reversal, and have reached the conclusion that one or more of them are meritorious.

In view of our having reached such conclusion, we deem it expedient to confine our discussion and attention to only such of these objections urged as appear to possess some substantial or meritorious force.

The court's criticized instruction No. 1 we find unobjectionable, unless it be upon the ground argued, with which we do not concur, that it is not, even under the scintilla rule, supported by sufficient evidence to justify its giving, in that such instruction would only be properly applicable to a case where the evidence substantially tended to show that the public's use of the pass-

way over and across appellant's tracks, at the place in evidence, was of such continuous character and volume during the night hours here in question as to constitute it a public passway and those using it at such time licensees, whose presence at such point in the passway leading across its tracks appellant was required to anticipate and duly perform the special precautionary duties imposed under such conditions upon it, of keeping a lookout and giving warning to such licensees of the approach of its trains and the movement of its cars across such pasway.

The appellant concedes that the public's use of this pathway over its tracks during the daytime hours was, both in its volume and continuous use, such as rendered those using it at such time licensees, entitling them to receive the special protection arising from such status and imposing the additional anticipatory duty upon the appellant, when moving its trains, of expectancy as to the probable presence of persons upon the tracks, at this public pathway crossing over its tracks, where much public travel thereover was known to be customary and frequent, and by reason of which, it was charged with the additional duty of maintaining lookout, warning, etc., to avert injuring them while exercising their licensed use of the pathway leading across its tracks.

However, appellant contends that its proof clearly showed that the pathway in question was not a public passway, constituting its nighttime users licensees, for the reason that its evidence conclusively showed that the use made by the public of this pathway during the *night hours,* embracing the time and hour of 9:30 to 10:30 p. m., at which time the appellee testifies he was here attempting to use the pathway in going to his home when injured, was not of such volume and continuous nature as to constitute it a pathway of such public character, either in respect to the volume or regularity of the public's use of it, as was sufficient to constitute it a public way, at such night hour, or those then using it licensees, whose presence there it was required at such time to anticipate and exercise the aforesaid special protective duties of lookout, warning, etc., to avoid injuring them.

For such reason it insists that plaintiff (appellee) was on this occasion a trespasser upon its tracks, to

whom it owed none of these special or any duties, claimed owing licensees, except only the one imposed by the last clear chance rule, of using the means at its command to avert wantonly injuring him even though then a trespasser, after discovering his position of peril on its tracks, which here it is admitted was never discovered.

Appellant contends that such being the clear showing made by the evidence or testimony of its witnesses, that the court should have given a peremptory instruction, as it moved for upon this ground, that the evidence utterly failed to show plaintiff was a licensee when injured, even if he were then in and using the pathway over its tracks, as it was at such time, by reason of its then infrequent use, not one of such character as imposed any anticipatory duty upon it, requiring special precautionary measures to be observed to avert injuring users of the crossing whose presence was not then to be anticipated.

However, it is to be remembered, in considering this claim of appellant, that appellee testified in conflict with its witnesses' testimony that he too made his own count or check of the number of pedestrians using this pathway during such night hours and that he found it substantially the same as during the daytime, which counsel for appellant concedes was sufficient to constitute its users licensees, charging it with anticipatory duties.

Therefore, the evidence on this point while strongly preponderating in quantity and perhaps quality over the positive and contradictory testimony of the appellee and his witnesses, it nonetheless results that the evidence presented upon this question was highly conflicting and of such contradictory character as, we conclude, precludes the court's sustaining appellant's motion for a peremptory instruction upon this issue, but further that it authorized the court's giving of the challenged instruction No. 1, submitting the issue to the jury of whether the pathway over the tracks was a public passway at the night hour when appellee was injured when crossing its tracks.

In the case of Southern Railway Company in Kentucky v. Sanders, 145 Ky. 679, 141 S. W. 77, 79, these questions were presented, upon facts and evidence sim-

ilar to that appearing in the instant case, both as to whether the plaintiff was at the night hour when injured a licensee, traveling over the company's tracks, or was, by reason of the public's very slight and infrequent use made of a passway over the tracks at such hour, not then a licensee but only a trespasser upon its tracks. In discussing this point, the court said:

"But, however this may be, if he is to be treated as a trespasser, the motion for a peremptory instruction to find for the company should have . been sustained because the company only owed him the duty of exercising ordinary care to protect him after his presence on the track was actually discovered, and the evidence is conclusive that the trainmen did everything that could have been done to avoid the injury after his peril became known. If, however, appellee is not to be treated as a trespasser, but as a licensee, and the company owed him a lookout duty, there is enough in the record to take the case to the jury on the theory that his peril by the exercise of the required care could have been discovered in time to have prevented the accident. * * *

"We have written in a number of cases that it is the duty of a railroad company, when moving engines and cars upon tracks where the presence of persons using the tracks as a matter of right or as licensees must be anticipated, to give warning of the approach of the train, to operate it at a reasonable rate of speed, and to keep a lookout. This care is not only exacted at places where the public have a right to use the right of way and tracks, as at street crossings and the like, but is also exacted at points on its road in cities, towns and populous communities where the public generally have been in the habit of using with the knowledge and consent of the company its tracks and right of way. * * *

"But, in places where the right of way and tracks of the company are used substantially as the evidence shows they were at Lawrenceburg, the *duty of the company is not at all times of the day and night the same. For example, the company might consent to and be charged with notice of the use of its tracks and premises by licensees during*

*certain hours of the day, or during the entire day. But in the night, the tracks and premises at these places might be used seldom or not at all by travelers, and consequently the company would not be under the same high duty to anticipate their presence on the track during these hours as it would be during the daytime. It does not follow* that because persons, who in large numbers habitually use its tracks and right of way during certain hours of the day or during the entire day, are to be treated as licensees, that it will be used in the same manner during the night, or that the company owes in the day and night the same degree of care. There is and ought to be a distinction between the duty owing by a railroad company at all times of the day and night and under all circumstances and conditions at places where travelers have the right to be, as on public crossings and streets that are occupied by railroad companies, and the duty it owes on its private premises and yards set apart by it for its own use and business.'' (Italics ours.)

The instant case, and its facts as to the time, place, and circumstances under which the plaintiff claims to have been injured by appellant's cut of cars, upon this night occasion, well illustrates the difference in the character of duties owing by the appellant, and as is well stated in the case, supra, to users of a passway over its tracks, which is held to arise from a material difference in the volume and continuous character of use of the passway by the public during the day and nighttime hours, as was both there and here evident. The evidence here strongly tended to show that during the daytime the pathway crossing was habitually and continuously used by a great number of people, estimated by the testimony at some 150 to 200, in daily going by the path across the tracks to and from their places of employment or their schools, and that, by reason or as a result of such regular and extensive use of it by the public, they became licensees in their use of the tracks at such place and time, to whom the company owed a special precautionary and anticipatory duty; but during the night hours, a different showing is made by the preponderance of the evidence to the effect that there was no substantial use then made of the pathway, in that very few people, and even those with no regularity, used the crossing passway during

the night hours here involved, and therefore that the plaintiff, when using the pathway at such time of night, the appellant contends, was not a licensee, but a trespasser, to whom the company owed only the one duty of exercising ordinary care to avert injuring him after his presence and peril on the tracks was discovered.

As to this, it is further in the Sanders Case, supra, rightly said:

"The general rule is that, when persons who have no business with the company come on its private grounds and on places where the general public have no right to go or be, they are trespassers. Brown's Adm'r v. Louisville & Nashville Railroad Co., 97 Ky. 228, 30 S. W. 639, 17 Ky. Law Rep. 145; Louisville & Nashville Railroad Co. v. Redmon's Adm'x, 122 Ky. 385, 91 S. W. 722, 28 Ky. Law Rep. 1293; Chesapeake & O. Railway Co. v. Nipp's Adm'x, 125 Ky. 49, 100 S. W. 246, 30 Ky. Law Rep. 1131. * * * But, when the use by the public of the tracks and private premises of a railroad company becomes frequent and common, the law in its regard for human life and limb puts upon the company the duty of exercising care to prevent injuring the persons thus using its grounds. So that a person may at one time and place be a licensee, and at another time but at the same place be a trespasser; the changed condition growing out of the different use by the public of the place."

This rule of law was here recognized and attempted to be given the jury by the court, under its instruction No. 3, where, and in accord therewith, it was instructed as to the very limited nature of a licensee's right as such, when using an established public crossing, to keep within the boundaries of the passway, without attempting to extend such right of passway by venturing to cross at other places over its tracks. By this instruction the jury was told that if it believed from the evidence "that the plaintiff *.* * attempted to cross said railroad tracks and was injured at a place other than *the pathway referred to in the evidence,* * * * the law is for the defendant." (Italics ours.)

However, we do not deem it needful to decide, nor are we to be taken as here deciding, that instruction No. 1 was on such ground erroneous, as there was here sufficient evidence on the issue as to the volume of the

night use of the crossing as to warrant submission of the question to the jury.

Here plaintiff has by his own testimony practically admitted that upon this occasion (even if he then was keeping within the pathway leading across appellant's tracks) he carelessly, and as if indifferent to and forgetful of the natural dangers confronted with of passing trains in this switching yard of the appellant, with which he had for years been familiar, did (without looking to see if the approach of a train threatened his then making use of the pathway crossing over the tracks) advance and was stepping thereon when a passing shadow arrested his attention, causing him to stop and turn with his back to the approaching train, which immediately struck, ran over, and injured him.

Such being the self-evident negligent conduct of the appellant, as is by himself testified and admitted, it must be taken to conclusively show an entire failure by plaintiff to exercise any care or precaution whatever for his safety at the crossing, and therefore the plaintiff must be held, as a matter of law, by reason of such negligence and lack of any care exercised by him for his own safety in stepping into the known pathway of danger, to have so contributed to his injury and loss of his arm that but for his negligence it would not have occurred, whether or not at such time and place a licensee, to whom special duties looking to his safety were owing by appellant.

In the case of Illinois Cent. Railway Company v. Bozarth's Adm'r, 212 Ky. 426, 279 S. W. 636, 637, where the evidence, as here, was undisputed that decedent was killed by stepping from a place of safety in front of a moving train without looking, it was held error not to direct a verdict for the defendant railroad company on the ground of contributory negligence. There the court said:

"Decedent had lived alongside of the railroad for a number of years, and knew that trains frequently ran on that track, and, so knowing the danger, he apparently voluntarily and unnecessarily disregarded the ordinary rules of prudence.

"As said by this court in the case of Neal v. Ashland-Ironton Transfer & Ferry Co., 201 Ky. 332, 256 S. W. 721:

" 'It is true that generally speaking the question of contributory negligence is one for the jury, but where all the material facts stand confessed, and they show that the plaintiff was guilty of such negligence that the injury would not have otherwise occurred, then there is nothing to submit to the jury.' "

Again, in the case of Louisville & Nashville Railroad Co. v. Sizemore's Adm'r, 221 Ky. 701, 299 S. W. 573, 574, it was held that where one walking on railroad track without looking and with his head down against approaching train is struck by train, he is, as a matter of law, guilty of such contributory negligence that no recovery can be had for death or resulting injuries. There we said:

"Conceding, but not deciding, that this track was used by a sufficient number of people to require the railroad company to anticipate the presence of pedestrians upon it, still, in using it as he did, at the time he did, Sizemore was guilty of such contributory negligence as to relieve the L. & N. R. Co. of responsibility for his death, which was due to his own inexcusable lack of care and precaution for his own safety in exposing himself to a most hazardous situation, without any necessity for so doing and without taking any precautions."

Again in the case of Smith's Adm'r v. Cincinnati, N. O. & T. P. Railroad Co., 146 Ky. 568, 142 S. W. 1047, 1049, 41 L. R. A., N. S., 193, quoted with approval in the Sizemore Case and much alike in its facts with those of the Sizemore and instant cases, we approved the action of the trial court in directing a verdict for the defendant, saying:

"The duty of using ordinary care to learn of the approach of a train imposes upon the traveler the duty of using the only means by which he can discover its approach. Nor is there anything in this rule that conflicts with the attitude of this court towards the 'stop, look, and listen' doctrine. That doctrine has never been followed in this state, because it exacts too high a degree of care in the part of the traveler. Under that rule, the traveler must do three things: He must stop. He must look. He must listen. There are times, however, when the requirements of ordinary care may be satisfied

with less. Thus in approaching a railroad track, where there is a clear, unobstructed view of the track for several hundred feet in each direction, a jury may well conclude that looking in each direction is all that is necessary. In other cases they may conclude that ordinary care required the traveler to stop and look, or to stop and listen, or to look and listen, or to stop, look, and listen, depending on the peculiar circumstances of the case. While for this reason, therefore, we have refused to adopt the 'stop, look, and listen' rule, we have never held that a traveler, who made no effort of any kind to discover the approach of a train, exercised ordinary care for his own safety.''

Therefore, it is our conclusion that its being clearly shown that here the appellee failed to exercise, when entering upon the railroad crossing in the switching yard of the appellant, with the dangerous nature of which he, it is shown, was familiar, any degree of caution or care whatsoever for his safety (either by stopping, looking, or listening to ascertain if any approaching or passing trains were in dangerous proximity or in any wise evidencing any regard for his safety before venturing to cross the tracks, whereon he was instantly struck), such indifference and want of concern and regard for his safety must needs be viewed and treated by us as conclusively showing, where, as here, such careless conduct is admitted, or at least not denied by appellee, a clear violation of his reciprocal duty, imposed upon him by the law in such case and under such circumstances, to exercise ordinary care. It of necessity follows that the appellee being found by his own testimony not to have exercised any care for his own safety, he must be held guilty of such contributory negligence, as a matter of law, as bars his recovery for any resulting injury and the trial court should have, for such reason or upon such ground, sustained appellant's motion for a directed verdict for it.

But if perchance we should be in error as to our appraisement of the testimony and its effect upon the issue of contributory negligence, we yet further conclude that the court should have sustained the motion for a directed verdict in favor of defendant upon the ground that the testimony conclusively shows that the injuries sustained by plaintiff, even if produced by a

collision with defendant's moving cars, occurred and happened 100 feet west of the pathway in question, which was at a point not requiring any anticipatory duties of defendant.

In reaching this conclusion, we are not unmindful of, nor have we overlooked, the testimony of appellee asserting differently, that he was on the pathway leading over the tracks when he was injured. But notwithstanding such claim of appellee, it must be rejected in view of the indisputable physical evidence, convincingly disproving it, here presented by the piece of flesh and bone of the arm and especially the stain and pool of blood therefrom on and by the north rail of appellant's track No. 1, found at a point thereon 100 feet west of the pathway, unerringly and finally designating that place and point on the track, so stained and marked by the pool of blood, as the place where the appellee lost his arm.

By the court's instruction No. 3, the jury was told that if the appellee, Joseph Welsh, attempted upon this occasion in evidence to cross the said railroad tracks and was injured at a place other than the path, then it would find for the defendant company.

While approving this statement of the law as to the liability of the appellant being limited and conditioned in this case upon the jury's believing from the evidence that appellee's injury was received when crossing within this passway, and not otherwise, we yet are of the opinion that the giving of such instruction was here improper, to the extent that it authorized the jury to find a verdict at variance with the showing of this conclusive physical evidence, or, that is to say, that the accident occurred, as testified by appellee, while he was in the passway, crossing the tracks.

It is our view that the testimony of the appellee, in making such contention as to the place where he was injured, was altogether contradicted and nullified by the physical facts here shown, as set out supra, and that therefore the appellant was entitled to have had given it, upon such evidence, the peremptory instruction it moved for, directing the jury to find for it.

In the very recent case of Hauser v. Public Service Company of Indiana, 271 Ky. 206, 111 S. W. (2d) 657, 659, in discussing the question of the conclusive weight

of well established physical facts over those testified to utterly at variance therewith, we said:

> "It is true that the credibility of the witnesses is for the jury, and that as to the amount of evidence necessary to take a case to the jury the 'scintilla' rule prevails, but that rule requires that the evidence be of relevant consequence, possessed of the quality of proof, and having fitness to induce conviction. Clark v. Young's Ex'x, 146 Ky. 377, 142 S. W. 1032. It is also the rule that, where the facts testified to are utterly at variance with well-established and universally recognized physical laws, and therefore inherently impossible, the courts may refuse to submit the case to the jury. Louisville Water Company v. Lally, 168 Ky. 348, 182 S. W. 186, L. R. A. 1916D, 300; Louisville & Nashville Railroad Company v. Chambers, 165 Ky. 703, 178 S. W. 1041, Ann. Cas. 1917B, 471. Another statement of the rule is that, where the evidence is so opposed to common sense or common experience that reasonable minds cannot entertain different opinions about it, it should be withdrawn from the consideration of the jury. Davis v. Judson, 159 Cal. 121, 113 P. 147."

Also, to like effect, the Supreme Court of Pennsylvania, in the case of Lessig v. Reading Transit & Light Co., 270 Pa. 299, 113 A. 381, 382, in dealing with the superior weight to be given physical facts over express testimony in contradiction thereof, said:

> "In the present case plaintiff's testimony cannot be accepted in the face of the infallible physical facts. * * * Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible."

See, also, Seiwell v. Hines, 273 Pa. 259, 116 A. 919, 21 A. L. R. 139; Cochran's Adm'rs v. C. & O. Railway Company, 232 Ky. 107, 22 S. W. (2d) 452; Groth v. Thomann, 110 Wis. 488, 86 N. W. 178, 181; and Moore on Facts, Vol. 1. p. 203, sec. 152.

The text on the point under consideration, and which was approved by the Wisconsin court, says:

> "When physical situations or matters of common knowledge point so certainly to the truth as to leave

no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which, in mere words, conflicts therewith. The fact established by the situation itself and matters of common knowledge, so clearly that no one can reasonably dispute it, notwithstanding evidence to the contrary, must stand uncontroverted and uncontrovertible, condemning as false such contrary evidence, either upon the ground of mistake or something worse.''

The soundness of this rule has been generally as well as by us repeatedly approved.

Influenced by this rule announced and found here applicable and controlling, it must needs follow that the learned trial court erred in refusing, upon this second ground also, to sustain appellant's motion made for a peremptory instruction, and for its error in this also its judgment must be, and it is, reversed.