# Silver Fleet Motor Express v. Wilson.

Oct. 9, 1942.

H. C. Gillis, R. W. Keenon and Robert M. Odear for appellant.

B. B. Snyder, J. C. Bird, and C. S. Wilson for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

This is an appeal from a judgment awarding appellee $4,000 damages for injuries sustained in a collision between an automobile owned and driven by her husband and a truck owned and operated by appellant. The collision occurred about 6:30 o'clock on the morning of August 14, 1940, on a curve while the automobile was ascending a mountain known as "Gillian Hill" about seven miles east of Corbin, to which City, Wilson, his wife, and four guests were returning from a pleasure ride which started after midnight from Wilson's restaurant and tourist camp in South Corbin. The original destination after leaving Corbin had been "The Pinnacle" the peak of a high·mountain overlooking Cumberland Gap, some fifty-five miles distant; but because of a drizzling rain and the consequent danger of ascending so high a peak, the party stopped at a restaurant and dance hall near Middlesboro, and started back home about 3:30 o'clock. Occupying the front seat between Wilson and his wife was a waitress employed at his restaurant. In the rear, and immediately behind Wilson were a night club proprietor, one of the latter's waitresses, and another waitress of Wilson's.

Of the six occupants of the car only five testified, and of these, only Wilson attempted to give a coherent account of the accident, although all five stated that the automobile was on the right side of the road and proceeding at a moderate speed. The male guest who did not testify was "leaning up over the back seat" talking to Wilson, and the latter admitted that he approached the curve at a speed of from thirty to thirty-five miles an hour. According to Wilson, he first saw the truck when he was "practically right on the curve, when I rounded the curve. The tractor was headed across the center line and the trailer was still on the right side with the tractor headed across this way when I rounded the curve, and it caught my car in front and jerked it down, the left side of my car came on by the tractor and stopped about eight feet, I imagine, above the truck, and the truck continued on into the hillside on my side of the road." He claimed that his car was struck by the left front wheel of the tractor, and the evidence showed that this was the point of contact. The tire of the left front wheel of the tractor was slit, the wheel and axle knocked back, and the fender turned up against the hood. The damage to the car was confined to its left front and side, and the left front wheel was knocked back under it and so demolished that in the opinion of appellee's wrecking expert and mechanic, T. H. King, the car could not have traveled forward afterward. The appellee produced no witness to the collision, other than the car's occupants, the majority if not all of whom, have similar suits pendind; and, with the exception of E. W. Asher, who arrived on the scene an indeterminate period thereafter, all of the witnesses who studied the positions of the colliding vehicles and the marks and debris on the road and its shoulders, testified that the front end of the Wilson car, with its left front wheel crushed, was from twelve to eighteen inches beyond the center line dividing its proper path from the path of the truck. The rear of the car was on its right side of the road headed toward Corbin, and the front end of the tractor was burrowed into the hill on the left side of the road leading in the opposite direction. The tractor and loaded trailer weighed approximately 16,000 pounds and their combined length was nearly 30 feet. Its driver testified that in descending the mountain in third gear, he first saw the Wilson car as it was coming around the curve at a speed of about forty miles an hour. The car was sliding on the curve,

and was on the wrong side of the road. He tried to stop, sounded his horn, and pulled as far as he could to his right against the posts guarding the outer edge of the curve. Immediately afterward, the Wilson car struck the tractor, inflicting the damage to the tractor's left front wheel, tire, and fender. In addition, the impact threw his brake lock, and broke his "booster" and air hose, causing the truck, without steering or brake control, to angle across the road to the left bank beyond the point of collision. The testimony of the truck driver is fully corroborated by two disinterested witnesses, E. H. Taylor, a lawyer of Morristown, Tennessee, and Allen Smith, an automobile salesman of the same place. They were driving separate cars down the mountain, Smith leading, a short distance behind the truck. Taylor did not see the actual collision but heard the noise made by the impact, and immediately thereafter saw the truck "going diagonally across the road and into the bank on its left side of the road." When it started across "it was on its right side of the road, and I would say probably off the shoulder on its right side." A moment later when he reached the scene, "the left front of the car was over the black line, the center line of the highway, not so very far from a foot to 18 inches of the left front part of the automobile across the highway and on the left of the highway going up the mountain." We quote the following from his testimony:

"I examined the tracks, such tracks are left by a double wheel truck. I mean two wheels together, and these tracks lead from the double wheel on the truck where it had stopped to the wreck. In going down that mountain at that curve just this side of where the accident occurred I noticed those tracks were there on the right side of the road going down the mountain, and going up to about 20 to 30 feet from where the accident must have happened the tracks started off the road on the shoulder.

"Q. On which side? A. Right side; and, right at the point of the accident the tracks became somewhat blurred as if the brakes had been applied and the truck went abruptly off the road, and the tracks left abruptly off the road. To the right, almost against the guard rail; they continued that way for ten (10) feet, and then went angling across the road into the bank.

"Q. Did you notice the effect, if any, that had been produced on the cable attached to the posts? A. One of the cables on one of the posts had been pulled aloose like as if it had just bent down.

"Q. Notice any glass or debris there? A. Yes sir, some glass and quite a bit of black mud like it had been mixed with grease.

"Q. Dry? A. Of course, the road was wet but the mud was dry.

"Q. Where was the greasy mud? A. On the righthand side of the road going down the mountain. That is, the most of it. Some little on the other, but the great amount on the otherside.

"Q. You have had occasion to investigate automobile accidents? A. Yes sir.

"Q. From that have you become familiar of evidences as to the point where the collisions occur? A. I think I have.

"Q. Can you tell what effect these findings of this mud and these shakings off of cars have as to indicating where the collision occurs? A. The mud and dirt from the bottom of a car usually will fall where the impact takes place because that is what shakes loose.

"Q. That on the right side of the center line of the road? A. The great amount of it was. There was a little on the other side.

"Q. You see some broken glass there? A. Yes sir.

"Q. And broken parts of a car? A. Yes sir.

"Q. On which side of the center line were they on? A. On the righthand side of the road going down the mountain.

"Q. This evidence you saw, the impact and dirt and those things, where did you find them with respect to where you saw this truck just before it started angling across the road? A. At the same place.

"Q. Where with relation to the posts that was hit and cables broken loose? A. Just about along the same place that the cable was pulled alose from the post.

"Q. Opposite it out in the road? A. Yes, about that.

"Q. How far down the road did that truck travel after these evidences of the impact showed there on the road? Go down the road any distance before it turned angling across or before it started to angling? A. I would say approximately ten (10) feet."

Mr. Smith, who was one curve above where the accident happened, saw the car and truck collide and settle down. Said he:

"The truck was on the right side of the road, the right wheels off the pavement."

The Wilson car, after striking the truck, rebounded toward its side of the road and was across the center line on the wrong side when he reached the scene. The truck did not move back after the impact, but "eased around behind the car" and "ran against the bank on the left side into a ditch." He did not examine the tracks or the guard posts, but saw the broken glass and parts of the car on the truck's side of the road about two feet from the center line.

Dallas Reidner, who, with his father, R. G. Reidner, Sr., came upon the scene of the accident approximately an hour after it had occurred, testified:

"The part of the car that was tore down and the left front wheel was around three feet over on the Silverfleet side; it was around a forty or forty-five degree angle across the highway."

This testimony was similar to that of his father, and both of them testified to the truck tracks on the shoulder of the road on the right side going south. In addition, they testified to the existence of a mark made by the deflated left front tire of the truck beginning at a point right of the center line and extending across the highway into the embankment. They also observed the condition of the guard rails at the right of the road indicating that they had been scraped by the truck prior to the collision, the debris to the right of the center of the highway, and other details which fully corroborated the account of the collision given by the truck driver.

Our conclusion that the Wilson car failed to follow its proper path around the curve, and continued or skid-

ded across the center line of the road and into the left front of the tractor which occupied the outer edge of the curve, is not based upon a preference for the testimony given by the disinterested witnesses over that given by the car's occupants, since the veracity of the witnesses was a question for the jury. It is rested upon the indisputable physical facts in harmony with the testimony of the disinterested witnesses, including that of appellee's witness, King, who visited the scene within twenty or thirty minutes after the accident and removed the wrecks after causing photographs to be taken which we regret our inability to reproduce in this opinion.

Having established by his testimony the position of the Wilson car as heretofore given, King was asked by appellee's attorney if it is a fact that when the wheel of a car is struck and knocked down it has a tendency to pull the car forward at that point. He answered in the affirmative, but on cross-examination stated that in a collision the heavier vehicle will knock the lighter back, and that while he could not say in this case whether this had resulted, he was of the opinion from the condition in which he found the Wilson car that it could not have traveled forward any distance. While he could not say which vehicle had struck the other, he was of the opinion, from the location of the debris on the left side of the road going toward Corbin, that the collision occurred left of the center line. He had observed the tracks on the shoulder on the outer curve where the truck had pulled off to the right, and located the guard posts struck by the truck as slightly above, and at an angle of from forty to forty-five degrees from the point where the Wilson car was standing ten or twelve feet distant. The tractor was found headed into the bank on the opposite side at a point where the destruction of its left front tire would have had a tendency to throw it. Appellee's argument that the truck, in avoiding a speeding car which had preceded the Wilson car, struck the posts and angled across the road into the Wilson car, is completely answered, not only by the testimony of eye witnesses and the position of the Wilson car after the collision, but by the fact that the damage which set the angling process in motion resulted from an impact upon the tractor's left front tire and wheel.

We have frequently refused to say that the resulting condition of colliding vehicles, road marks, and other

similar physical evidences of the manner in which a collision occurred were, of themselves, sufficient to overcome oral testimony of actual witnesses to the contrary. Southern Oxygen Company v. Martin, 291 Ky. 238, 163 S. W. (2d) 459; Silver Fleet Motor Express et al. v. Casey, etc., 288 Ky. 233, 155 S. W. (2d) 863; Union Underwear Co. et al. v. Barnett, etc., 285 Ky. 488, 148 S. W. (2d) 339. In other cases we have held that where the physical facts pointed so unerringly to the actual causes of the collision as to leave no room for a contrary determination, a verdict embodying such determination would be set aside as unsupported by the evidence. C. L. & L. Motor Express Co. et al. v. Achenbach, 259 Ky. 228, 82 S. W. (2d) 335; Louisville & Nashville Railroad Co. v. Welsh, 272 Ky. 120, 113 S. W. (2d) 879. This case is of the latter class, and hence, under the practice approved in the case of Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d) 877, the Trial Court should have sustained appellant's motion for a directed verdict. If another trial should be had at which evidence of a nature sufficient to take the case to the jury is introduced the Trial Court will conform its instructions to the rulings of this Court in the case of National Linen Supply Co. v. Snowden, 288 Ky. 374, 156 S. W. (2d) 186.

All questions not discussed or disposed of, including the correctness of the instructions, are reserved.

Judgment reversed.