# Louisville & N. R. Co. v. Lankford's Administrator.

(Decided May 28, 1935.)

ASHBY M. WARREN and LOW & BRYANT for appellant.

FORESTER & CARTER and C. B. SPICER for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

The dismembered body of Gilbert Lankford was discovered about daylight June 25, 1933, on the track of the Louisville & Nashville Railroad Company just inside the corporate limits of the city of Harlan. Frank Lankford, brother of the deceased, qualified as administrator of his estate and brought this action against the railroad company to recover damages for the death of Gilbert Lankford allegedly caused by the negligent operation of one of the defendant's freight trains at or near a street crossing in the city of Harlan. It was also alleged in the petiton that 300 to 500 people traveled along defendant's track daily at the point where Lankford was killed. The plaintiff obtained a judgment for $2,000 against the railroad company, which the company seeks to reverse on the sole ground that the trial court erred in overruling its motion for a peremptory instruction in its favor made at the conclusion of the plaintiff's evidence and renewed at the conclusion of all the evidence.

It is appellee's theory that the decedent was killed about 3:15 a. m. at a point where the railroad tracks cross Camden street, while appellant contends that the evidence conclusively shows that Lankford was struck at least 25 feet south of Camden street. The railroad tracks at the point in question run practically north and south and cross Camden street which runs east and west. Camden street is 123 feet north of the south corporate limit of the city. Appellant maintains three tracks across the street. The first track from west to east is a passing track and the next is its main track from which branches a switch leading to the Sunshine Oil Company's plant. The switch stand is located 25 feet south of Camden street. At Camden street the crossing is protected by cattle guards and the railroad right of way at this point is fenced.

The dismembered body of the deceased was found between 4 and 4:15 a. m. on June 25, 1933, by J. C. Warren who was picking up coal on appellant's right of way. As he walked north, he first saw a hat lying against the left rail at the switch point, and a little farther north, but south of the cattle guard, he saw one

leg and he saw blood stains and pieces of flesh and bones on the left rail from the switch stand to the crossing. The body of the deceased was right on the track about 5 feet north of the crossing. Warren called Gordon Mahan, T. F. Francis, and W. D. Tinker, who lived nearby, and they immediately went to the place where the decedent's body was found. Mahan testified in part as follows:

"There were small pieces of cloth from the point of the switch on down about sixty feet to the place of my termination, down beyond the crossing. I didn't go any farther down than where the body was at. There was just little pieces of cloth on the ties and rail. One leg was located just above the crossing or between the crossing and the point of the switch and the other one was near the lower side of the street. The body was still farther down the railroad track below the street."

Tinker testified that the body was north of the crossing. He walked from the crossing to the switch point and saw pieces of flesh and bone on the right rail facing north, a spot of blood at the switch stand, pieces of cloth strewn on the ground, and hair on the ends of the cross-ties 35 or 40 feet south of the point where the body was found.

T. F. Francis testified that he saw a man's foot at the switch point and flesh and blood on the inside rail at that point. A hat was on the end of the ties near the foot. The undertaker and his assistant stated that they picked up pieces of the body south of the crossing.

These and a number of other witnesses who testified to the same facts were introduced by the defendant. All of plaintiff's witnesses, however, who were at the place of the accident soon after the body was found and who examined the track south of the crossing, testified to facts tending to indicate that the decedent was struck at or about the switch point, approximately 25 feet from the crossing. There is no contrariety on this point in the testimony of the witnesses who had made an examination of the ground.

Robert Snell, a witness for the appellee, went to the place of the accident a few minutes after the body was found. He saw pieces of flesh and blood on the rail from the switch point to the crossing. Frank Cole saw

flesh, blood, and hair on the cross-ties and rail from the switch stand to the point where the body was lying.

The physical facts testified to by witnesses, both for the appellant and the appellee, lead to the inescapable conclusion that the decedent was struck south of the Camden street crossing. The only testimony which appellant claims creates a scintilla of evidence tending to show that Lankford was struck on the crossing is that of Tom Jones and George Walters. These witnesses claim that they went to Golden Ash, about 3 miles from Harlan, in search of whisky. They left Harlan about 8 o'clock on the night of June 24 and, being unable to find any whisky when they reached Golden Ash, they returned to Harlan about midnight. While walking south along an alley which runs parallel to the railroad tracks 41½ feet south of the railroad right of way, about 3 o'clock in the morning, they saw a man walking north on the main track about half way between Camden street and an alley which crosses the railroad tracks 123 feet south of Camden street. A freight train was approaching from the south about 400 or 500 feet away traveling at the rate of 25 or 30 miles an hour. The railroad tracks near the Camden street crossing were flooded with light from the headlight on the engine. They thought they recognized Gilbert Lankford and one of them asked, "Is that you, Gib?" and the man on the track answered, "Yes." They testified that when they first observed him he was "murmuring" or trying to sing. After speaking to Lankford, they walked south to an intersecting alley and then west to the railroad tracks. While waiting for the train to pass, they looked north and saw Lankford at or near the cattle guard on the south side of the Camden street crossing. The train cut off their view of Lankford and they went to their respective homes without knowing that he had been struck. The testimony of these witnesses does not bear the impress of truth, but their credibility was a question for the jury. If their testimony is accepted as true, however, it does not create a conflict in the evidence sufficient to authorize a submission of the case to the jury. While it can be inferred from their testimony that Lankford at the time he was struck was north of the switch stand, yet they do not place him on the crossing. When they saw him approaching the crossing, they were at a point 123 feet

south of him and were not in a position to gauge his position on the track with accuracy.

The physical facts, which are undisputed, show conclusively that Lankford was struck at or near the switch stand.

It was shown that the decedent was under the influence of intoxicating liquor at 5 o'clock on the afternoon before his death and also at 9 o'clock. His movements from that time until 3 o'clock the following morning, when Jones and Walters claim they saw him on the railroad track, are unaccounted for. He was clearly a trespasser upon appellant's track to whom the railroad owed only the duty of exercising ordinary care with all the means at its command to prevent injury after discovery of his peril and there is no evidence tending to show that his peril was discovered. A railroad company owes to a trespasser no lookout duty. Coleman's Administrator v. Chesapeake & Ohio Railway Company 246 Ky. 29, 54 S. W. (2d) 361; Louisville & N. Railroad Company v. Davidson's Administrator, 246 Ky. 231, 54 S. W. (2d) 911; Louisville & N. Railroad Company v. Dooley's Administrator, 220 Ky. 67, 294 S. W. 810. An effort was made to prove that the railroad tracks at the point where Lankford was killed were used by a sufficient number of persons as a footway to convert the users into licensees and consequently to put upon the servants of the railroad company the duty to anticipate their presence there. Where the public generally, with the knowledge and acquiescence of a railroad company, habitually uses its tracks, the company is charged with notice of such use and must anticipate the presence of people upon its tracks. Louisville & N. Railroad Company v. Philpot's Administrator, 215 Ky. 682, 286, S. W. 1078. The mere fact, however, that the place is within the corporate limits of a town or city does not in itself impose on the servants of the railroad company the duty to keep a lookout or to give signals. Louisville & N. Railroad Company v. Smith's Administrator, 186 Ky. 32, 216 S. W. 1063.

Two or three witnesses testified that from 200 to 300 persons who lived along the railroad south of Harlan used the track south of the Camden street crossing daily and one witness put the number at 400 or 500, but these witnesses admitted that practically

all of the use of the tracks was during the daytime and none of them said that the track was used to an appreciable extent after midnight. No facts were presented which placed upon the operatives of appellant's trains the duty to anticipate the presence of persons on its track at 3 o'clock in the morning or which authorized the submission of that question to the jury.

In Hoback's Administrator v. Louisville, H. & St. L. Railway Company, 99 S. W. 241, 30 Ky. Law Rep. 476, it was said:

"Even though appellee knew that its track, at the place in question, was used by people in that locality, and had been so used in passing from their homes to the neighboring villages, yet this use, so far as the proof shows, had been confined principally to Sundays and to reasonable hours in the daytime, and appellee would certainly have no right to expect nor be required to be on the lookout for trespassers upon its track at the dead hour of midnight."

In Southern Railway Company in Kentucky v. Sanders, 145 Ky. 679, 141 S. W. 77, 79, which involved a somewhat similar state of facts, the court said:

"But, in places where the right of way and tracks of the company are used substantially as the evidence shows they were at Lawrenceburg, the duty of the company is not at all times of the day and night the same. For example, the company might consent to and be charged with notice of the use of its tracks and premises by licensees during certain hours of the day, or during the entire day. But in the night, the tracks and premises at these places might be used seldom or not at all by travelers, and consequently the company would not be under the same high duty to anticipate their presence on the track during these hours as it would be during the daytime. It does not follow that because persons, who in large numbers habitually use its tracks and right of way during certain hours of the day or during the entire day, are to be treated as licensees, that it will be used in the same manner during the night, or that the company owes in the day and night the same degree of care. There is and ought to be a distinction between the duty

owing by a railroad company at all times of the day and night and under all circumstances and conditions at places where travelers have the right to be, as on public crossings and streets that are occupied by railroad companies, and the duty it owes on its private premises and yards set apart by it for its own use and business. The facts of this case serve very well to illustrate the difference between the duty of the company at a street crossing and its duty in yards and premises owned and occupied by it. Here the place where appellee was injured was situated between two streets and was the private property of the railroad company. It had been set apart for its use in the transaction of its business and was occupied by its tracks and other buildings and property. It was not crossed by any street or public way, nor was it used for travel by the public, except on foot, but the company by its conduct recognized the right of the public to use these premises, and, when a railroad company permits large numbers of the public to habitually travel to and fro upon its tracks and right of way, it must take care not to injure them, as the license to use the premises carries with it the assurance that the licensee will not be harmed by the neglect or carelessness of the licensor. This undertaking, however, on the part of the company, only embraces those periods in which the public is in the habit of using the premises under a license, and does not apply at all times.''

To the same effect are Louisville & N. R. Co. v. Napier's Administrator, 230 Ky. 323, 19 S. W. (2d) 997; Louisville & N. R. Co. v. Bays' Administrator, 142 Ky. 400, 134 S. W. 450, 34 L. R. A. (N. S.) 678.

The evidence conclusively shows that Gilbert Lankford was struck by a train at a point on appellant's track between Camden street and an alley 123 feet to the south and where the railroad right of way was fenced. Under the circumstances, the deceased was a trespasser and those in charge of the train owed him no duty until his peril was discovered. It follows that the circuit court erred in overruling appellant's motion for a peremptory instruction in its favor.

The judgment is reversed for further proceedings consistent herewith.