## Louisville & N. R. Co. v. Lefevers' Adm'x.

(Decided Feb. 15, 1938.)

ASHBY M. WARREN, J. C. BAKER and H. L. BRYANT for appellant.

J. B. SNYDER and GEORGE R. POPE for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

This is an appeal from a judgment for $5,000 against the Louisville & Nashville Railroad Company recovered by the administratrix of the estate of Pearl Lefevers, deceased. The action was brought to recover

damages for Lefevers' death, allegedly caused by the negligent operation of one of appellant's trains at a public road crossing.

Lefevers' body was found early in the morning of September 28, 1935, on a track referred to in the record as the "tail track," at a point 125 to 130 feet from the crossing described in the petition. The body was practically severed at the waist line, and was under the trucks of an empty coal car which had been set on the track about 10:30 p. m. the previous night. A cut of 22 empty freight cars had been placed on the tail track, and the body was found under the fourth car from the crossing. The cars were about 40 feet in length. It is appellee's theory that the decedent was struck at the crossing and his body carried to the point where it was found, and that appellant's employees in charge of the cut of cars negligently failed to keep a lookout or to give the required signal of its approach to the crossing. The proof shows that the cut of cars which was being backed onto the tail track was traveling at a rate of speed not exceeding five miles an hour when it approached the crossing. A number of grounds are relied upon for reversal of the judgment, but, in view of our conclusion that the evidence fails to show that Lefevers was struck at the crossing or at a point where appellant owed him any duty other than the exercise of ordinary care to avoid injuring him after his peril was discovered, and consequently that appellant's motion for a directed verdict in its favor should have been sustained, the other grounds need not be considered.

Arlin Brock, a witness for the plaintiff, testified that he saw the body of the decedent before it was moved, and that he called Charles Bevins, mine superintendent of the Harlan-Wallins Coal Corporation, to assist him in taking the body from under the car. He stated that he saw blood near the place where the body was found, and that marks in the cinders indicated that it had been dragged a distance of 15 or 20 feet. Charles Bevins, who was also the plaintiff's witness, testified as follows on direct examination:

"Q. Did you examine that ground for any indications about whether the ground was disturbed for any distance below where his body was found? A. Yes sir.

"Q. How far? A. Eighteen feet.

"Q. What was the indications there? A. It looked like it had been rolled. The cinders was disturbed.

"Q. Did you see any blood? A. Yes sir.

"Q. Did you examine the cars that were above the tipple or above his body to see whether they had any indications on them of having passed over his body? A. Yes, sir.

"Q. How many of them showed indications of having passed over his body? A. The cars—there had been eighteen cars that showed on the wheels.

"Q. How many cars was above him? A. He was under the front end of the nineteenth car.

"Q. Did you examine the front car? A. Yes, I did.

"Q. Did you see anything on it? A. No, there was no indications on the front car that I saw.

"Q. How far above the crossing or how far above the switch point was it to where the body of Pearl Lefevers was found? A. I would say from that driveway to where the body was found, judging from the length of the cars, it was something between 125 to 130 feet.

"Q. You do not mean from the cars, do you? Where did you say that was from, not the crossing, was it? A. From the crossing, there was three L. & N. hoppers setting above the crossing and he was under the end of the fourth car.

"Q. How far was it, Mr. Bevins, from the switch down here up to where his body was found? A. I don't know. From the switch on the run around track to where the body was found was 150, no, about 132 feet to where the cinders was torn up and to where somebody had been sitting, that was eighteen feet back from where the body was found.

"Q. What are you talking about, where somebody had been sitting? A. He had been sitting in the cinders.

"Q. You say where somebody had been sitting. Do you know where that was where somebody had been sitting or where he had been dragged? A. There was the prints of a man's pants in the cinders and his body was found eighteen feet above that.

"Q. This place you was talking about in the cinders, that was not where his body was found, was it? A. No sir.

"Q. And how far did you say it was from there to where his body was found? A. Eighteen feet.

"Q. That switch point is below the crossing, isn't it? A. Yes.

"Q. Mr. Bevins, was you there with anyone and did you say it was 130 feet from the switch point to where the body was found? A. I might have said that to them, but after I looked at my notes it was different. It is 132 feet to where somebody was sitting in the cinders and eighteen feet to where the body was found."

On cross-examination, he was asked these questions and made these answers:

"Q. At any time while you were with that body up there or about that time, did you inspect that ground and the premises there to see what signs you could find as to whether the body had been dragged or not? A. I did.

"Q. You stated it had been dragged about eighteen feet. Did you see any signs there or could you find any indications further down toward this road crossing than eighteen feet from where this body was actually picked up. A. No, I didn't."

Elmer Lefevers, brother of decedent, lived across a road or path from the railroad tracks and below the crossing at which it was claimed Pearl Lefevers was struck and killed. The distance from the crossing to his home is fixed by the witnesses at 150 to 300 feet. He testified that his brother came to his home shortly after 10 o'clock the night he was killed to borrow an automobile. When the witness last saw his brother, the latter was walking up the path or road toward the crossing. He lived with his mother on the opposite side of the railroad tracks in what is known as the "Upper Camp." Elmer learned the following morning that his brother had been killed, and he walked to the place where the body was found, a distance of 100 yards from his home. Concerning the conditions he found there, he testified as follows:

"Q. Did you see the place the next day where he was found on the railroad? A. Yes.

"Q. Tell the jury if there was any abrasions or disturbances of the cinders on the railroad for any distance below where his body was found? A. Yes, there was.

"Q. For what distance did you see in the direction of this crossing was the cinders disturbed? A. I can't hardly say.

"Q. Could you give an estimate or guess at it? Twenty-five or twenty feet? A. Twenty, twenty-five or thirty feet."

All the witnesses who testified concerning the physical conditions at the point of the accident placed the first sign of blood or disturbance of the cinders and gravel more than 100 feet from the crossing. Two or three witnesses saw the decedent during the night at a pool room in the town of Molus, which is across the railroad tracks from his mother's home where he lived, and one or two saw him walking in the direction of the crossing shortly before the accident. No one saw him at or on the crossing. The physical facts testified to by plaintiff's own witnesses, who examined the rails, ties, and roadbed between the crossing and the place where the body was found, tend to show that Lefevers was struck not at the crossing, but at a point at least 100 feet beyond it.

Appellee argues that the decedent had no occasion to go upon the railroad track beyond the crossing after he left his brother's home, but that the crossing was the most convenient way for him to travel to his home, and therefore it must be presumed that he was struck at the crossing and carried to the point where his body was found. It is her theory that the lead car picked him up and carried him 100 feet before dropping him on the track, or that he grasped some part of the car with his hands when he realized he was about to be struck and held himself suspended for that distance. This is mere surmise and speculation, and not an inference warranted by the proof. Appellee relies upon Sims' Adm'r v. Chesapeake & Ohio Railway Company, 140 Ky. 241, 130 S. W. 1081, 1082, in which it was held that the evidence was sufficient to take the case to the jury on the question as to whether the accident occurred at a crossing. The body of Sims was found about 35 feet east of the crossing, and the evidence concerning the point where he was struck is described thus in the opinion:

"The cinders were scuffed up as if something had been dragged over them from the road. Other witnesses testified to seeing the sign of a body being dragged in the cinders from the second or third tie beyond the end of the plank nailed on the ties for the crossing, and to seeing the blood and hair and scraps of his clothes on the ties west of the cattle guard, which was 8 feet from the crossing."

The physical facts in the Sims Case showed almost conclusively that Sims was struck at the crossing. The proof as to the giving of signals of the trains' approach to the crossing was pro and con, and really made the only issue in the case. The case of Louisville & Nashville Railroad Company v. Welsh, 272 Ky. 120, 113 S. W. (2d) 879, decided December 17, 1937, is more clearly in point. There the physical facts tended to show that Welsh was struck about 100 feet east of the crossing. He claimed that he was struck at the crossing, but it was held that his testimony was without probative value, in view of the physical facts, and the case was reversed on the ground that the court erred in overruling the defendant's motion for a directed verdict in its favor. See, also, Louisville & Nashville Railroad Company v. Napier's Adm'r, 230 Ky. 323, 19 S. W. (2d) 997; Louisville & Nashville Railroad Company v. Lankford's Adm'r, 259 Ky. 670, 83 S. W. (2d) 18.

Our conclusion is that the plaintiff's evidence failed to show a state of facts which would reasonably warrant an inference that Lefevers was struck at the crossing. On the contrary, the only inference that can reasonably be drawn from the evidence is that he was struck at a point at least 100 feet from the crossing. Under these circumstances, he was a trespasser, and those in charge of the cut of cars owed him no lookout duty. Louisville & Nashville Railroad Company v. Lankford's Adm'r, supra.

The judgment is reversed, with directions to grant appellant a new trial, and for further proceedings consistent herewith.