# Louisville & N. R. Co. v. Lefever's Adm'x.

Nov. 5, 1941.

J. C. Baker, H. L. Bryant, J. Miller White and H. T. Lively for appellant.

C. B. Spicer and George R. Pope for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Reversing.

In Louisville & N. Railroad Company v. Lefevers' Administratrix, 272 Ky. 152, 113 S. W. (2d) 1136, we reversed a judgment for $5,000 for the death of Pearl Lefevers, alleged to have been caused by the negligence of the railroad company in striking him at a public crossing in or near Molus, in Harlan County. We were of opinion that the court should have directed a verdict for the defendant because the physical facts, the place where the cinder ballast was first disturbed, blood on the rails and wheels, and the location of the body, destroyed the effect of testimony which only afforded speculation that the man was struck on the crossing or at a point where the company did not owe him any duty other than that of a trespasser. Negligence in that respect was not proven.

After the reversal of the judgment the company took the deposition of the administratrix as on cross-examination, and she deposed she knew of no witness who had not testified on the first trial, and no additional evidence. However, she indicated little personal knowl-

edge about the preparation of the case, saying that the witnesses talked "to my brother and my husband and my attorney." Her husband is W. H. Collette and her brother John Hoskins. The case was continued from time to time.

On November 28, 1939, nearly two years after the mandate reversing the first judgment was issued, the company took the deposition of Earl Gibson, at Manchester, Clay County. He deposed that he was in Arkansas when Lefevers was killed in September, 1935. He returned not long afterward and on December 23, 1935, he went with Collette and Hoskins to the place where the accident occurred and Collette revealed to him a plot in which he, Gibson, Sanford "Cowboy" England, "Big Charlie" Saylor and George Sweeten should testify that they were playing cards by flashlight at a certain nearby point and had seen Lefevers on the crossing when he was struck by the cars. The witness described the proposed scheme in detail. Each of these men was to receive $15 certain and $30 if the case were won. It seems that the witness revealed the scheme because he was not paid for attending court when the case had been called but not tried. He stated that Collette had given him money now and then but had stopped because, he said, England had told about the scheme and the railroad company knew of the frame-up. While the confession of the willingness to participate in the nefarious plot stamps Gibson as disreputable, his recitation of the story leaves the impression that he was telling the truth. This is fortified by subsequent events. Not long after this deposition was filed, Judge J. B. Snyder, who had been representing the plaintiff, withdrew from the case on notice and C. B. Spicer took his place. On this trial Collette denied Gibson's story and testified that Gibson, who was boarding at his house, had told him he knew about the accident and he had had him and Charlie Saylor summoned as witnesses. Having investigated their story and found it false, Collette would have nothing to do with them. Hoskins testified as to other things, but was silent about this.

The evidence presented by the plaintiff on this trial, which occurred in February, 1940, was about the same as on the first trial. But there were three new witnesses. Another verdict for $5,000 for the plaintiff was returned and judgment entered thereon. The railroad

company insists that it was entitled to a peremptory instruction upon this trial, contending that the additional testimony is without probative value. Further grounds submitted are that the deceased was guilty of contributory negligence as a matter of law; an erroneous instruction was given, and incompetent evidence admitted.

Lefevers left the saloon and pool room of his uncle, John Hoskins, in what is called the "Lower Camp" at Molus about 10 o'clock that night. He lived with his mother and stepfather in the "Upper Camp" below there on the other side of the "tail track" of the railroad company. As on the former trial, the evidence was that Lefevers traveled down a walk way, crossed Pide Branch on to the Saylor creek road a short distance before it crosses the track. Joe Sweeten testified, as he did before, to having passed and spoken to Lefevers on the road a short distance from the crossing. He had stopped for a few moments at the home of his brother, Elmer Lefevers, who lived between the road and one of the switch tracks below the crossing. As before, none of those witnesses undertook to place the man on the track at the crossing, their testimony only showing that he was nearby and going in that direction. As described in the former opinion, the physical facts indicated that he was struck by a cut of cars more than 100 feet above the crossing and that his body had been run over by 18 cars. It was found the next morning under the fourth from the last of a cut of 22 cars.

One of the new witnesses was Bill Napier. He had seen Lefevers at his uncle's saloon during that evening. He left an hour or an hour and a half afterward going in the same direction. On the railroad crossing he found a pipe and a can of tobacco about one-third full. It was a dark night but he had a flash light. The afternoon of the next day Napier gave the articles he had found to Collette, the deceased's stepfather, and told him where he had found them. His brother, Elmer Lefevers, was present and the two men examined and identified the pipe as belonging to the deceased. This witness lived within three or four hundred yards of Collette during all the time but says he did not know about the first trial until it was over. He did not know why he had not been called as a witness. The deceased's aunt, Mrs. John Hoskins, testified that she had sold Lefevers a can of tobacco that night like that which was found,

and he had sat on the bed and filled his pipe just before he started out. She identified the pipe and the can of tobacco as belonging to him. Four and a half years had passed and this important evidence had been kept by a friend and the close neighbor and the brother and stepfather of the deceased as a strict secret. It had been called for trial in the meantime but Napier was not there or subpoenaed to be there. There is no explanation for this other than that it must have been an afterthought, induced by the necessities of the case.

Another newly discovered witness was Sid Brock. He got with Charlie Meeks that night at the bath house and they went down the road together. As we understand, they went from the Upper Camp and crossed the railroad track in a direction opposite to that in which Lefevers traveled. Brock testified that at a point about 75 yards from the crossing and about the same distance from Elmer Lefevers' house, he stepped into the bushes off the side of the road and sat down. He heard Pearl Lefevers talking to his brother, Elmer, and saw him leave. Then he heard him and Joe Sweeten speaking to each other at the crossing. He "made a quick spring to get off the railroad." The night was not very dark and one could see to travel without a light. About noon the next day the witness heard that Lefevers had been killed. That evening he went to Collette's home where the body was. He swore he had not said a word to anybody about what he knew during the four and a half years until he talked with a claim agent or attorney for the railroad company in the witness room at the court house just before he was called to the stand. Asked if he had ever talked to Collette or Hoskins or Judge Morris Saylor (a kinsman of the deceased and actively interested in the case), the witness replied, "No, absolutely no." The reason assigned for this was, "I was afraid it might hurt their feelings and I didn't think anything about the lawsuit."

Charlie Meeks testified that he had stepped into the bushes off the road "for the simple reason, back in them days, if you were caught standing on the road you had to tell your particular business why you were standing there." He heard Pearl Lefevers at his brother's home and saw him come out. Pearl "rushed a little bit" to get to the crossing. A string of cars was coming up the track. In endeavoring to have the witness locate the

meeting point of the deceased and Joe Sweeten, the witness responded: "The last I saw of Pearl he was jumping out of the way of the train." When the witness got up the next day about eleven o'clock, his wife told him about Lefevers having been killed. He went to the funeral. "It was a good long while after the first trial was over before anybody knew that I knew anything about it." So he testified. He didn't remember when he first told about it, but "we ganged up, three of four or five, and by talking it got around and was mentioned and I told about it." That was six months after the first trial. He knew about that trial because "You hear about it all over the county." He had not been summoned then or for the day on which a re-trial had been set in the previous fall. It was only two weeks before the present trial that he was told that he would be used as a witness by Collette.

The testimony of these three witnesses added to the other evidence made out a case for the plaintiff. Counsel for the appellant submit that it is unworthy of belief. We agree. But the jury believed it and they are the triers of the facts. Counsel maintain that it is not probative evidence, which we have so often defined as being testimony of substance and relevant consequence; not vague or uncertain, but having the quality of proof or fitness to induce conviction of truth. Henderson v. Lane, 202 Ky. 610, 260 S. W. 361; Globe Indemnity Co. v. Daviess, 243 Ky. 356, 47 S. W. (2d) 990; Dyche v. Scoville, 270 Ky. 196, 109 S. W. (2d) 581. The definition has reference to the substance of the testimony generally and not the credibility of the witness. True, credibility is involved where testimony is directly opposed to physical possibilities or scientific facts. And in the Daviess case, supra, the story told was deemed so improbable, we held the trial court committed error in directing a verdict based wholly upon the testimony. That too related to the substance, not to the witness. The testimony of these three witnesses is not vague or uncertain, nor what they related improbable or inconsistent. It shows the man was struck at the crossing. The weakness of the testimony is not what they saw or how they described it. The weakness is the improbability that they saw anything at all. That is, as we have said, strictly a matter for the jury. Other testimony of Brock and Meeks not quoted added to the evidence of a number of other witnesses to the effect that the train was

backed over the public crossing without a light or signal established negligence. The physical facts as described in the former opinion and on this trial constituted evidence to the contrary. As has been said over and over again that presents a question for the jury to decide. Upon the point of proven negligence, we think the defendant was not entitled to a peremptory instruction.

This was a dirt road, practically unimproved, connecting the two mine camps. Just below the crossing is the tipple where there are three tracks. These converge into one at switches about 100 feet below the crossing. The single track from there on is called the "tail track," on which empty cars are placed to be released and rolled by gravity to the tipple for loading. Around this crossing are a number of houses and a school house. There are electric lights close by. On the night Lefevers was killed an engine had pulled 22 cars up to the switch. It then went around them to the other end and pushed the cars over the crossing back up the "tail track" and left them. It was at this time, apparently, that Lefevers was run over. His brother and a number of others testified that there was no signal given as the cars approached the crossing and no light or brakemen on the end. All of them knew of the presence of this train, not only from seeing it but from hearing the noise it made by considerable puffing and switching. As Joe Sweeten was seeing the train backing up from the tipple he saw Lefevers down at the side of the track between it and his brother's house which is near the tipple. It was a "tolerable light night." Sweeten had crossed the track and met Lefevers 25 or 30 feet from the crossing going toward it. The place is open and without obstruction of any kind.

We turn back to the testimony of Sid Brock and Charlie Meeks. In order to put Lefevers on the crossing when he was killed, they went a little too far with their story. Their testimony showed clearly that he knew the train was coming and tried to beat it across. These men testified that they saw the train, saw Lefevers leave his brother's house on the side of the railroad close to the crossing, saw him get there about the time the cars did, and saw him rushing to cross and spring in front of the cars. Just before that Meeks says he saw Sweeten jump out of the way of the train.

The railroad company's trainmen testified that two

of them were riding the end of the cars and had a light or lantern on it. They never did see the men. That he was struck by the cars either at the crossing or above it is certain.

Considering all the testimony introduced by the plaintiff, which is in no way strengthened by the defendant, we are of opinion that it proved the deceased knew the cars were approaching right at the crossing, and, with that knowledge, undertook to cross ahead of them. Or, at most, that he failed to use his eyes and ears or take any sort of precaution to learn of the train's approach. In either event, he was guilty of contributory negligence as a matter of law. Chesapeake & Ohio R. R. Co. v. Conley's Administratrix, 261 Ky. 669, 88 S. W. (2d) 683; Louisville & N. R. R. Co. v. Welsh, 272 Ky. 120, 113 S. W. (2d) 879; Chesapeake & Ohio R. R. Co. v. Bryant's Administrator, 272 Ky. 339, 114 S. W. (2d) 89; Louisville & N. R. R. Co. v. Brock's Administrator, 281 Ky. 240, 135 S. W. (2d) 898. These late cases cite many early opinions to sustain the conclusion above expressed. We are of opinion, therefore, that the court should have peremptorily instructed the jury to find for the defendant upon this ground.

The former opinion is the law of the case as to this being a public crossing. The claimed error in admitting evidence and of an erroneous instruction is predicated on it not being established by dedication to be such a crossing.

Judgment reversed.

Whole court sitting.