## BALTIMORE & O. R. CO. v. POSTOM.
### No. 9826.

United States Court of Appeals
District of Columbia Circuit.

Decided July 11, 1949.

Mr. Stephen Ailes, Washington, D. C., with whom Mr. Paul F. Mickey, Washington D. C., was on the brief, for appellant.

Mr. Joseph Luria, Washington, D. C., for appellee. Messrs. William R. Lichtenberg and Samuel Barker, Washington D. C., also entered appearances for appellee.

Before EDGERTON and WILBUR K. MILLER, JJ., and ALEXANDER HOLTZOFF, District Judge, sitting by designation.

HOLTZOFF, District Judge.

This is an appeal by the defendant from a judgment for the plaintiff in an action to recover damages for wrongful death, which

resulted from a grade crossing collision between a railroad train and an automobile. The question presented is whether the defendant's motion for a directed verdict was properly denied. This problem, in turn, may be divided into two parts: first, whether there was substantial evidence that appellant's negligence was a cause of the collision; and, second, whether the deceased was guilty of contributory negligence as a matter of law.

Isabell Postom, the deceased, and her sister, Ordelia Lanford, were passengers in an automobile operated by one Osborne McKinney. The deceased sat in the front seat next to the driver, while her sister occupied the rear seat of the two-door sedan. The car was proceeding from Washington to a small suburban settlement in Maryland, lying east of the tracks of the Baltimore and Ohio Railroad. On the way, McKinney attempted to drive the automobile across the railroad tracks at a point in Maryland known as Millrace Crossing. While going over the intersection, the automobile became lodged on the tracks with the left wheels off the crossing and the left front wheel wedged down between the rails. A freight train was approaching from the right. McKinney and Ordelia Lanford managed to alight through the left door of the automobile and escape the impending catastrophe. The deceased was killed in the ensuing impact between the train and the automobile.

The appellant made a motion for a directed verdict, on the ground that there was no substantial evidence of negligence, and further, on the ground that the deceased was guilty of contributory negligence as a matter of law in failing to leave the automobile in time to avoid injury. The motion was denied by the trial court. The case was submitted to the jury on the issues whether the crossing was negligently maintained in an unsafe condition, and, if so, whether the defective condition of the crossing was the proximate cause of the death. In addition, the question of contributory negligence was likewise left to the jury.

Before analyzing the evidence on these two aspects of the case, it seems useful to restate the pertinent principles of law by which these matters are to be governed. To justify the submission of a case to the jury and to permit its verdict to stand, it is necessary that there be substantial evidence to support either conclusion that may be reached. A mere scintilla of evidence is not sufficient. Substantial evidence is evidence of such quality and weight as would be sufficient to justify a reasonable man in drawing the inference of fact that is sought to be sustained.[1] If substantial evidence is presented, which, if credited, would sustain a verdict in favor of one party or the other, the case should be left to the jury. It is not for the court to weigh the evidence on both sides of a contested issue. To do so is the function of the jury. If the evidence is conflicting, the conflict must be resolved by the jury. If divergent inferences may be drawn from the evidence, the selection of the proper deduction is also a function of the jury. If the evidence is contradictory, the process of reasoning followed by the jury may comprise two steps: first, to determine which account of the incident to accept; and second, to decide which of two or more possible inferences should be drawn from the version so adopted. From the mere fact that the evidence permits two or more possible inferences, it does not

1 Kane v. Northern Central R. Co., 128 U.S. 91, 9 S.Ct. 16, 32 L.Ed. 339; Jones v. East Tennessee, V. & G. R. Co., 128 U.S. 443, 9 S.Ct. 118, 32 L.Ed. 478; Washington & Georgetown R. Co. v. McDade, 135 U.S. 554, 570 et seq., 10 S.Ct. 1044, 34 L.Ed. 235; Gunning v. Cooley, 281 U.S. 90, 95, 50 S.Ct. 231, 74 L. Ed. 720; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 67-68, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Bailey v. Central Vermont Ry., 319 U.S. 350, 353-354, 63. S.Ct. 1062, 87 L.Ed. 1444; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520; Wilkerson v. McCarthy, 336 U.S. 53, 62, 69 S.Ct. 413; Smith v. United States, 61 App.D.C. 344, 62 F.2d 1061; Bell v. Brown, 76 U.S. App.D.C. 5, 128 F.2d 317; Shewmaker v. Capital Transit Co., 79 U.S.App.D.C. 102, 143 F.2d 142; Curley v. United States, 81 U.S.App.D.C. 389, 392 et seq., 160 F.2d 229.

necessarily follow that the evidence is not substantial and is not sufficient to sustain the jury's finding. To be substantial, the evidence need not point entirely in one direction. The trial court on a motion for a directed verdict must view the evidence from the standpoint most favorable to the adverse party. It must assume that the jury may resolve the conflict against the moving party, and from the facts as found draw the inference most favorable to his opponent. If there is substantial evidence from which such deductions can be made, the motion must be denied, as the jury is clothed with the function and power of determining whether to make them. The Supreme Court has frequently formulated and reiterated these principles. A few quotations from its opinions will suffice:—"It is well settled that, where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them." Richmond & Danville R. Co. v. Powers, 149 U.S. 43, 45, 13 S.Ct. 748, 749, 37 L.Ed. 642. "'Where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences', the case should go to the jury." Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 451, 87 L.Ed. 610, 143 A.L.R. 967. "The very essence of its [i.

e. jury's] function is to select from among conflicting inferences and conclusions that which it considers most reasonable." Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520.[2]

True there are expressions in some cases to the effect that if the facts give equal support to each of two conflicting inferences, or are consistent with either of two hypotheses, neither may be deemed established.[3] An analysis of such statements irresistibly leads to the conclusion that they cannot be reconciled with the principles which have been adopted by a majority of the decisions and which have just been summarized. These assertions do not represent the accepted view of the law. If they did, the court would have to determine in each case whether the evidence is capable of only one conclusion and unless it answered this question in the affirmative, the trial would terminate with a directed verdict. The court would then really be deciding questions of fact, subject to a subsequent veto on the part of the jury if the court submitted the issues to it.

McKinney claimed that the crossing was in bad shape; that it was composed, in part at least, of soft gravel, and that this condition caused the left front wheel of his automobile to slide off the crossing and on to the ties and ballast, from which he was unable to extricate the car in time to avoid the disaster. The appellant denied that the condition of the crossing was unsafe and claimed that it was a fair inference that McKinney missed the crossing and drove

---

2 "Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720. In Lavender v. Kurn. 327 U.S. 645, 66 S.Ct. 740, 90 L. Ed. 916, the question at issue was whether the plaintiff's decedent had been murdered or was killed as a result of the defendant's negligence. The Supreme Court, 327 U.S. 645, at page 652, 66 S. Ct. 740, 90 L.Ed. 916, pointed out that there was evidence from which either inference might reasonably be made, but

since the jury made the inference that the deceased met his death as a result of defendant's negligence, it would be an undue invasion of the jury's function for an appellate court to arrive at the opposite conclusion. Among many other cases supporting this doctrine are, Tiller v. Atlantic Coast Line R. Co., supra, n. 1; Bailey v. Central Vermont Ry., supra, n. 1; Tennant v. Peoria & P. U. R. Co., supra, n. 1; Wilkerson v. McCarthy, supra, n. 1; Curley v. United States, supra, n. 1; Hart v. United States, 3 Cir., 84 F. 799, 804.

3 E.g. see Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339, 53 S.Ct. 391, 77 L.Ed. 819, and Ewing v. Goode, C.C., 78 F. 442, 444.

the left wheels of the automobile on to the rails.

An employee of the railroad company testified that the crossing had been repaired about one month prior to the accident. No records of repairs were produced and apparently none were maintained. This witness further stated that crossings constructed of amesite, as this one was, are hard surfaced and last a couple of years. Yet photographs taken by representatives of the railroad company three days after the accident, seem to indicate that the crossing was not in good condition: it appeared to have several deep ruts and marked depressions, some of which were filled with loose stones. On this point the appellant's witness seems to be impaled on the horns of a dilemma: either he was mistaken in his recollection that the crossing had been repaired only a month prior to the accident; or else he had grossly exaggerated ideas as to the lasting qualities of a crossing constructed of amesite. It is difficult to perceive how the jury could have reached any conclusion on this aspect of the case, other than that the railroad was negligent in the manner in which it maintained the crossing.

The seriously controverted issue was whether the defective nature of the crossing was a proximate cause of the accident. There is no evidence tending to show that the driver of the automobile was proceeding at an excessive rate of speed, or was otherwise negligent. The record indicates that he was apparently an uneducated, illiterate man, with a very limited vocabulary and a circumscribed power of expression. It may be fairly inferred from his explanation of the accident that he claimed that the automobile either slid off the front portion of the crossing, or possibly struck a rut in the crossing and jumped slightly to the left, thereby causing the left front wheel to become wedged between the tracks.

█ The appellant claims that the driver's explanation was physically impossible. This contention seems extreme. It was for the jury to determine whether to credit the testimony adduced in appellant's behalf. The jury evidently believed the driver's story, as it had a right to do. The appellant's contention that what actually happened was that the driver for some reason or other missed the intersection and drove onto the rails, is pure conjecture and sheer speculation. Assuming it to be one of several possible inferences from the physical facts, nevertheless, it was the function of the jury to determine what deduction to draw. The jury rejected the appellee's theory and accepted the appellant's story. It had a right to do so.

█ It is further claimed that the deceased was guilty of contributory negligence as a matter of law in failing to leave the stalled automobile promptly and make her escape, as was done by the driver and the other passenger. It must be observed that they managed to leave the car from the left immediately prior to the crash. The deceased was sitting on the right and, until the driver and the other passenger had successively used the only door on the left, could leave only from the right side. The train was approaching from the right.

█ The law is clear that in a moment of unexpected emergency and imminent danger, a person is not held to the use of the best possible judgment, or a high degree of prudence that one may be assumed to exercise in an interval of calm, when there is opportunity and time for reflection and deliberation.[4] What actually happened to the deceased immediately before the crash is unknown. She may have attempted to make her escape and may have found herself caught between the train and the automobile. She may have been petrified with fear. She may have misjudged the speed of the oncoming train. She may have encountered difficulty in opening the door. Any one of a number of things may have prevented her from escaping death. A person in her position is not required to think clearly and correctly and make the best possible choice of the course to pursue. The law makes allowances for the fact that when confronted with a sudden emergency

4 Ward v. District of Columbia, 24 App. D.C. 524; Jennings v. Philadelphia, B. & W. R. Co., 29 App.D.C. 219, 10 Ann.Cas. 761; Burhans v. Burhans, 159 Md. 370, 150 A. 795.

and an immediate peril, some people do not think rapidly or clearly, and failure to do so, does not constitute negligence as a matter of law. The question whether the deceased was guilty of contributory negligence was properly left to the jury, particularly as the burden of proof on this issue was on the appellant.[5]

We are of the opinion that the issues of negligence and contributory negligence were correctly submitted to the jury and that the verdict is sustained by substantial evidence.

WILBUR K. MILLER, Circuit Judge (dissenting).

I agree, of course, with these statements in the court's opinion: "* * * To justify the submission of a case to the jury and to permit its verdict to stand, it is necessary that there be substantial evidence to support either conclusion that may be reached. A mere scintilla of evidence is not sufficient. Substantial evidence is evidence of such quality and weight as would be sufficient to justify a reasonable man in drawing the inference of fact that is sought to be sustained." But the court should have added to those observations the settled rule that when the testimony of a witness is positively contradicted by the physical facts, the jury should not be permitted to give it credence. A verdict cannot be sustained when based, as it was in this case, solely upon the statements of a reckless witness whose falsehoods about the physical facts were exposed by the photographic truth, and whose theory of causation was inherently impossible. Such testimony is wholly without probative value and is not "substantial

evidence" which the court correctly says is necessary to support a verdict.

The following resumé of the evidence will show clearly that the case should not have been submitted to the jury. Osborne McKinney, the driver of the death car, had taken the two young women to a meeting in the District of Columbia on Saturday night. About midnight the three proceeded to nearby Maryland to visit what McKinney termed a "joint" which is shown by the photographs received in evidence to be the Thomas Beer Tavern just beyond the Millrace Crossing on the B. & O. tracks. McKinney crossed the side track safely but, when he reached the main track some thirty feet further, he missed or left the crossing and found himself on the ties to the left of it, with his front wheels, or at least the left one, against the rail, which was some six and one-half inches higher than the ties. He could not extricate himself and, seeing that a train was coming, he shouted to the girls to get out. McKinney himself left the two-door sedan through the left door. Mrs. Lanford, who was alone in the back seat, performed the difficult task of getting out the same door, climbing by or over the driver's seat, and escaped to safety. But Isabell Postom, who was seated on the front seat with McKinney, did not leave the car and was killed when the train struck it. She was not asleep but had been chatting with her companions as they approached the crossing.

The automobile was in good repair, having just passed inspection, and its lights enabled McKinney to have a clear view of the crossing as he approached it over a perfectly straight road. He said he was traveling at ten miles per hour and in second gear. He did not stop and look before at-

[5] Burden of proof on the issue of contributory negligence is a matter of substantive law and, hence, is governed by the local law of the forum. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Palmer v. Hoffman, 318 U.S. 109, 116 et seq., 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. In the District of Columbia, the right to recover damages for negligence is governed by the law of the place where the injury occurred, in this case, Maryland. Paxson v. Davis, 62 App.D.C. 146, 148, 65 F.2d 492; Tobin v. Pennsylvania R. Co., 69 App.D.C. 262, 263, 100 F.2d 435; Giddings v. Zellan, 82 U.S. App.D.C. 92, 160 F.2d 585. In Maryland, the burden of proof on the issue of contributory negligence is on the defendant. Hopper, McGaw & Co. v. Kelly, 145 Md. 161, 170, 125 A. 779; Taxicab Co. v. Ottenritter, 151 Md. 525, 534-535, 135 A. 587; Potomac Edison Co. v. State, 168 Md. 156, 169, 177 A. 163.

tempting to cross the main track.[1] He was familiar with the crossing. That is about all McKinney knew concerning what happened just before the train struck the automobile at 12:50 a. m. Sunday. He did not know why his car missed or left the crossing and landed on the ties and against the rail. He never attempted to explain why he drove off the left end of a fourteen-foot crossing.

On Monday McKinney returned to the scene to look for the girls' pocketbooks. While there he examined the crossing and found it, he said, to be of gravel loosely piled between the rails with nothing at the ends (on each side of the road) to contain it. There were planks on the outside of the rails but none inside, he told the jury. He deduced that the loose gravel had caused him to skid off the crossing three or four feet to his left and to become helplessly lodged against the far rail. He testified that the crossing was about eight feet wide, "Just wide enough for one car to cross", but that the road itself was wide enough for two cars to pass. This was the evidence, and the only evidence, from which the jury concluded the crossing was negligently constructed or maintained and that its condition caused the accident.[2]

[1] "Q. Had you stopped and looked and listened before you went on the tracks? A. No, sir, I didn't stop and look."

[2] The following excerpts from McKinney's testimony support the resumé which I have given. These questions and answers are taken from various portions of the transcript but are placed in continuity here solely for convenience.

"Q. What happened when you reached the rails? A. When I reached the rails, there was gravel in betwixt the rail and my left wheel slipped and caught on the rail. My left front wheel caught on the rail and I couldn't cross it.

"Q. Will you tell us again how you happened to get off the crossing and between the rails? A. There was gravel in twixt the rails, and when I got in twixt the rail, my front wheel slipped in the gravel and caught on the rail.

"Q. How wide is this crossing? A. Just wide enough for one car to cross.

"Q. Was there anything between the rails on either side of the crossing? A. On either side of the crossing, I think there was some wood on the outside of the rail and gravel on the inside, twixt the two rails.

"Q. Did your left front wheel skid on the gravel? A. Yes, sir.

"Q. It did skid on the gravel? A. Yes, sir.

"Q. What speed were you going when you got on the crossing? A. I would say about 10 miles an hour.

"Q. What gear were you in? A. I was in second gear.

"Q. * * * Did you see the railroad sign when you pulled up to this crossing? A. Yes, sir, I seen the sign, yes, sir.

"Q. You saw it that night? A. Yes, sir.

"Q. Had you stopped and looked and listened before you went on the tracks?

A. No, sir, I didn't stop and look.

"Q. When is the next time you went back to that crossing? A. I went back the next Monday evening following that Sunday morning. I goes back Monday.

"Q. What did you go back for? A. I goes back to find the pocketbooks they had lost.

"Q. While you were there did you examine the crossing again? A. I just looked to see why my wheel caught on the rail.

"Q. What did you see? A. The gravel was in twixt the rail. My wheels slipped in them and that made them catch on the rail and I couldn't cross.

"Q. Why do you think your wheels slipped? A. Well, I wouldn't know; on account of the gravel bed there and it just slipped off and caught on the rail.

"Q. Was this gravel just piled into this space loosely? A. Yes, sir.

"Q. Or was there anything in there to hold it together? A. It was just piled in there loose.

"Q. The day you were out there looking, was there any wood plank on the ends? A. There wasn't no wood planks on the end, twixt the rails.

"Q. * * * When did it first become clear to you that the reason why you missed this crossing was the fact that your car skidded on this gravel that was built up between the rails? A. Yes, sir. You mean when I knowed what happened? The reason I got hung on the rail?

"Q. That is right. A. It was the next day after I went back and looked.

"Q. What sort of shape were your lights? A. They were in good shape, all was burning; in good shape. They had been through the inspection.

"Q. You had a pretty good view, then, of this crossing when you drove up to it? A. Yes, I could see it.

Uncontradicted testimony of railroad employees showed that, a few weeks before, the crossing had been reconstructed with amesite, a material which almost immediately solidifies into a flintlike hardness. I regret that photographs of the crossing taken on Wednesday following the accident and received in evidence cannot practicably be reproduced here because they show conclusively that the crossing was not of the nature which McKinney described. It is not suggested that the railroad company had been so venal as to alter the construction of the crossing between the time of the accident and the time the pictures were taken. Confronted with one of the photographs, McKinney complained, "This picture don't show no gravel." The photographs show that each rail of the main track had a heavy plank on either side of it and parallel with it, all flush with the top of the rails. They also show at each end of the crossing a sort of bulkhead, a heavy plank or beam between the rails, parallel with the ties, and above the surface of the crossing proper. The photographs do not show a loosely piled gravel bed, but on the contrary a hard-surface crossing. McKinney's statement that the crossing was about eight feet wide and "Just wide enough for one car to cross" was contradicted by a photograph in which the crossing is plainly wider than the road approaching it. McKinney's comment from the stand as the picture was exhibited to him was, "It looks like a larger crossing than what it was then."

Had there been in fact a bed of gravel loosely piled on the crossing, an automobile entering it in second gear at ten miles per hour might have churned in it, but every automobile driver knows that it would not have skidded upward over the elevated confining plank at the end of the crossing and landed some three or four feet to the left. But McKinney's story about gravel loosely piled simply was not true, as the photographs plainly show.

"Q. You could see the crossing perfectly well as you came up there? A. Yes, sir.
"Q. * * * Is that crossing any narrower than the road out there? A. Yes, sir.

And if McKinney's testimony of a bed of loosely piled and unconfined gravel be construed as a statement that, at the time of the accident, there were loose pieces of ballast on the hard-surfaced crossing, his theory of causation is nevertheless incredible. For it is against natural law and common experience that loose rock on the crossing threw the automobile three or four feet to the left and over the elevated bulkhead when the car was moving at a rate of only ten miles per hour and in second gear.

Unless the verdict was based on mere caprice, the jury must have believed McKinney's story that there was nothing between the rails except a bed of gravel loosely piled and unconfined at the ends; but it had no right to believe McKinney's story and should not have been permitted to believe it, because the photographs reveal a crossing of an entirely different construction.

In a situation such as this, the law is clear and well established. When the testimony of a witness as to physical facts is demonstrated by photographs to be absolutely false, a verdict based on that evidence alone cannot stand. In Baltimore & O. R. Co. v. Muldoon, 3 Cir., 1939, 102 F.2d 151, 152, the court said:

"The principal question raised by the appeal is whether the court should not have declared the plaintiff guilty of contributory negligence as a matter of law and directed a verdict for the defendant.

"In determining this question the testimony must be read in the light most advantageous to the plaintiff, all conflicts therein being resolved in his favor, and he must be given the benefit of every fact and inference which may reasonably be deduced from the evidence. * * * Nevertheless any testimony which is contradicted by clearly proved and uncontrovertible physical facts must be rejected."

The court then applied the rule by rejecting the plaintiff's testimony that when he

"Q. How much? A. Two cars can pass on the road.
"Q. And in your best recollection, that crossing is only 8 feet wide? Is that a a fair statement of your view? A. Yes, sir."

stopped his truck at the railroad track he was only able to see fifty feet to the west because photographs showed that at the point where the plaintiff stopped he had an uninterrupted view to the west along the railroad tracks of more than two thousand feet.

Time and again federal courts have reiterated the rule. It was said in Hickey v. Missouri Pacific Railroad Corp., 8 Cir., 1925, 8 F.2d 128, 131:

"It must be conceded that, on the motion by defendant for a directed verdict, plaintiff was entitled to have taken in his behalf the most favorable view of the testimony. He was not entitled, however, to have credence given to testimony if it conflicted with plain physical facts."

The court stated in Chicago, M., St. P. & P. R. Co. v. Linehan, 8 Cir., 1933, 66 F.2d 373, 380:

"Defendant urges that the physical facts contradict the testimony of plaintiff. It is undoubtedly the law that, if the physical facts positively contradict the testimony of a witness, that testimony is not to be credited by a court or jury. Missouri, K. & T. R. Co. v. Collier, 8 Cir., 157 F. 347; American Car & Foundry Co. v. Kindermann, 8 Cir., 216 F. 499; F. W. Woolworth Co. v. Davis, 10 Cir., 41 F.2d 342.

"Evidence which cannot possibly be true is not substantial evidence."

The opinion in Chambers v. Skelly Oil Co., 10 Cir., 1937, 87 F.2d 853, 856, contains the following:

"The rule is likewise settled that 'when the testimony of a witness is positively contradicted by the physical facts, neither the court nor the jury can be permitted to credit it.' F. W. Woolworth Co. v. Davis, supra, 10 Cir., 41 F.2d 342, at page 347; American Car & Foundry Co. v. Kindermann, 8 Cir., 216 F. 499, 502; Missouri, K. & T. R. Co. v. Collier, 8 Cir., 157 F. 347, 353; Blackley v. Powell, 4 Cir., 68 F.2d 457, 459; Chicago, M., St. P. & P. R. Co. v. Linehan, 8 Cir., 66 F.2d 373, 380; Storey v. United States, 10 Cir., 60 F.2d 484, 486; Larabee Flour Mills Co. v. Carignano, 10 Cir., 49 F.2d 151, 153."

This generally accepted principle is followed also in the state courts. A clear exposition of the rule by an eminent judge is found in Coney Island Co., Inc., v. Brown, 1942, 290 Ky. 750, 162 S.W.2d 785, 787-788:

"It is, to be sure, ordinarily the function of a jury to determine the weight and effectiveness of the evidence. But this acceptation of the power or prerogative of the jury is subject to the quite universal qualification that the jury may not, through sympathy or other reason, arbitrarily or capriciously base its verdict upon a statement as to what occurred or how something happened when it is opposed to the laws of nature or is clearly in conflict with the scientific principles, or base its verdict upon testimony that is so incredible and improbable and contrary to common observation and experience as to be manifestly without probative value. 20 Am.Jur., Evidence, Sections 1183; 1184; Jones, Commentaries on Evidence, Section 461; Moore on Facts, Section 149 et seq; Annotations, 8 A.L.R. 796; 21 A.L.R. 141. We have recognized the rule in many cases and applied it in a number involving various kinds of incredible stories. See Louisville and Nashville Railroad Company v. Chambers, 165 Ky. 703, 178 S.W. 1041, Ann.Cas. 1917B, 471; Louisville Water Company v. Lally, 168 Ky. 348, 182 S.W. 186, L.R.A., 1916D, 300; Illinois Central Railroad Company v. Finchs' Adm'r, 178 Ky. 229, 198 S.W. 734; Hauser v. Public Service Company of Indiana, 271 Ky. 206, 111 S.W.2d 657. In some of the decisions we held that the testimony was so contradictory as not to constitute a scintilla of evidence and, therefore, not to have authorized a submission of the case to the jury, and in others that the verdicts were flagrantly against the evidence requiring reversal for another trial. Under the present practice, where the latter conclusion is now reached, the former rule is to be observed, for we now hold that a mere scintilla of evidence is not sufficient to take a case to the jury.

"Quite close to the foregoing rule as to contradiction of the physical laws is another which may well be applied here. It is that if the admitted physical facts, whether

corroborated by testimony of those who saw the accident or not, are so contradictory of the testimony of other witnesses as to how or where an accident occurred, a verdict based upon that testimony will be deemed by this court to be flagrantly against the evidence. Cumberland Railroad Company v. Girdner, 174 Ky. 761, 192 S.W. 873; Cochran's Adm'rs v. Chesapeake and Ohio Railway Company, 232 Ky. 107, 22 S.W.2d 452; C. L. & L. Motor Express Company v. Achenbach, 259 Ky. 228, 82 S.W.2d 335; Louisville and Nashville Railroad Company v. Welsh, 272 Ky. 120, 113 S.W.2d 879; Louisville and Nashville Railroad Company v. Lefevers' Adm'x, 272 Ky. 152, 113 S.W.2d 1136; Lambert v. Miller's Administrator, 277 Ky. 64, 125 S.W.2d 1019. * * *

"We would not be understood as imputing perjury to the plaintiff and her witnesses. We think their testimony is based upon a theory, and that the theory is destroyed by the physical facts and the unchangeable law of nature. We may close the opinion with the following extract from Spiro v. St. Louis Transit Company, 102 Mo.App. 250, 76 S.W. 684, 688, quoted in Moore on Facts, Section 154: 'Verdicts resting on evidence which looks contrary to the ordinary course of nature are not infrequently set aside, and retrials directed, by appellate courts, as a proper precaution against an unjust outcome of litigation. * * * This prerogative of courts of error is sparingly employed, but that it exists, as an emergency expedient, for the correction of verdicts palpably wrong, is certain. The appropriate use of it does not require a court to be convinced that the jury found an event to have occurred that was physically impossible or miraculous. It is enough if the event found was so improbable, according to the ordinary operation of physical forces, or was so overwhelmingly disproved by credible witnesses, as to compel the conviction that the jury either failed to weigh the evidence carefully, or drew unwarranted inferences, or yielded to a partisan bias.' "

It is plain that McKinney's negligence was the sole cause of the accident. His testimony concerning the condition and construction of the crossing was grossly false, and his theory of how the accident happened, formed only on his Monday visit to the scene, was contrary to common experience. In my view the jury's verdict is a completely unwarranted taking of the railroad company's money.